THE AMERICAN RAPID TELEGRAPH COMPANY *vs.* THE CONNECTICUT TELEPHONE COMPANY.

The Connecticut Telephone Company, organized as a joint stock corporation under the general law of this state, for the purpose of constructing and operating within the state mechanism for telephonic communication, purchased from the Bell Telephone Company, a Massachusetts corporation, which owned a patent for a telephonic device, a license for a term of years to use its device within a certain district in this state; the contract containing a provision that no telegraph company, without the consent of the licensors, who designated one company for the purpose, should be allowed through it to collect and deliver messages from and to its customers. Another telegraph company which had a station in the district, having demanded of the Connecticut corporation the same benefit with the other company, with an offer of payment, and been refused, applied for a mandamus to compel the corporation to grant the benefit. Held, in refusing the application—

1. That the Massachusetts corporation, owning the patent, had a right in granting licenses for its use to impose whatever restrictions it chose.

2. That the Connecticut corporation therefore acquired a right only to the restricted use of the patented device, and its duty to the public did not extend beyond that restricted use.

3. That the statute (Session Laws of 1879, ch. 36, amending Gen. Statutes, p. 342, sec. 8,) requiring all telegraph and telephone companies to receive despatches from all other telegraph and telephone lines and transmit them on payment of the usual charges, could not operate to compel the Connecticut corporation to do what it had no right to do.

4. That a Massachusetts statute to the same effect was to be regarded as

applying to the action of the Massachusetts corporation as a carrier of speech in that state, and as not affecting its right to manufacture its instruments and sell or lease them in other states as the owner of the patent.

APPLICATION for a mandamus; brought to the Court of Common Pleas for New Haven County. The principal allegations of the application were as follows:—

That the defendant, the Connecticut Telephone Company, was duly organized under the laws of this state, and located at New Haven, for the purpose of constructing and operating telephone instruments, and placing the same for hire in the dwellings, offices, stores and other places of business of the inhabitants of the various towns in this state. That it has an office in the town of Bridgeport, in this state, containing an apparatus which is connected by wires with a large number of its telephone instruments placed in nearly all of the banks, dwellings, offices, stores and other places of business of the inhabitants of Bridgeport, greatly accommodating them and constituting the only available means of continual and rapid communication with one another. That the plaintiff has an office in Bridgeport and is there carrying on the business of receiving and sending telegraphic messages to all parts of the world, and that it is absolutely necessary to the successful prosecution of its business that the plaintiff have one of the defendant's instruments placed in said office and the proper connections thereto attached. That the defendant by its incorporation under the laws of this state and its acceptance of the provisions thereof, is in duty bound, and has thereby contracted, to furnish its said telephone instruments to any person or corporation upon application and payment of its usual charges for the rent thereof; and that the defendant is able and in a condition to do what is herein asked for. That the plaintiff has applied to the defendant for said instrument and offered to pay its usual charges therefor, but the defendant has refused and still refuses and neglects to furnish said instrument or to give any valid excuse for such refusal or neglect. That the plaintiff, unless it shall be furnished with said

instrument and have the benefit of the connections controlled thereby, will be deprived of its just rights and suffer great damage by loss of business, and the citizens of said Bridgeport will also suffer great loss and inconvenience by being deprived of suitable and rapid means of communicating with the plaintiff in receiving and sending telegraphic messages to other parts of the world; and that the plaintiff and said citizens have no remedy unless by a writ of mandamus. Wherefore the plaintiff prays the court to issue a writ of mandamus requiring the defendant to furnish to the plaintiff one of its proper instruments and place the same in the office of the plaintiff in said Bridgeport, with proper connections attached thereto, in such manner as shall reasonably accommodate the plaintiff and the public and conform to the statute laws of this state regulating telegraph and telephone companies, upon payment of their usual charges, or signify cause to the contrary.

The court issued an alternative mandamus, and the defendant made a return setting up the following facts:—

That the defendant was organized as a joint stock corporation under the laws of the state of Connecticut, the object of the organization being stated in the articles of association as follows:—" The purpose for which it is constituted is to build, maintain, operate, own and control systems of telephone exchange in any or all of the towns situated in the state of Connecticut; to buy and sell the same, and to buy, sell, own and deal in any estate, real and personal; that may be necessary and convenient to the management of said business, and generally to do all things incidental and necessary to said business."

That Alexander Graham Bell invented a method of and apparatus for transmitting articulate speech by electricity, and March 7th, 1876, the same was duly patented to him by patent of the United States, by which the exclusive right to use and to license others to use, and to refuse to others the right to use said invention, was vested absolutely in said Bell and his assigns; and that the whole of said rights of said Bell were by him duly assigned to, and became

vested in the American Bell Telephone Company, a Massachusetts corporation; and that after the grant of said letters-patent to Bell, other inventors made various improvements in his apparatus, and in apparatus and appliances, such as call-bells, switches, switch-boards, etc., to be used therewith, which were duly patented to them, which patents have also been assigned to and are vested in the American Bell Telephone Company.

That subsequently, on the 8th day of February, 1881, the American Bell Telephone Company granted to the defendant the license under said patents, which is hereinafter more fully stated; in pursuance of which license the American Bell Telephone Company has leased to the defendant electric speaking telephone instruments made under said patents, and which in their operation conform to the method described in said Bell patent; and that the defendant has the right to use them in accordance with the terms of said license and not otherwise, but the exclusive grant contained in said patents makes it unlawful for the defendant to use them except so far as permitted by said license.

That in order to use the right so granted and the instruments so hired for such limited uses, the defendant has, at an expense of many thousand dollars, constructed a central office with a suitable switch-board, made and licensed under some of said patents, and has constructed lines of wire therefrom to a large number of private residences and private offices in said Bridgeport, and has placed in such residences and offices, and connected with said wires, telephone instruments so obtained from and licensed by the American Bell Telephone Company, and also, to be used therewith, call-bells and switches made and licensed under other patents in said license referred to, and has granted to the occupants of such premises the license and right to use them under a written contract, prescribed by the American Bell Telephone Company; by means of which instruments and connections, and by the patented method of said Bell, the said various licensed occupants are enabled

to communicate with each other and with said central office, and are licensed so to do to the extent and for the purposes in said sub-license specified.

That the defendant admits that the plaintiff is a telegraph company, and has a public office in Bridgeport, and is engaged in the business of transmitting for hire between said office and its other public offices outside of Connecticut, general business telegraph messages for all persons who may bring them to any of said offices for that purpose; that the practice of the plaintiff and other telegraph companies is, and for many years has been, to transmit such messages between its public offices and the private offices and residences of its customers by messenger boys, or by telegraphic wires constructed at the expense of itself or its customers for that purpose, and that the price it charges its customers includes a compensation for so doing; and the defendant admits that it would be greatly to the convenience and pecuniary profit of the plaintiff, if it could obtain the use of the defendant's system of wires, instruments, central office and the service of its servants to operate the same and keep them in repair, without cost to itself, or at a sum which would be nominal and inconsiderable, in comparison with the cost of performing the same service, entirely at its own expense; also that the facilities which would be afforded by the use of the defendant's wires, instruments, central office and operators, would increase the business of the plaintiff, and afford it greatly increased revenues and profits.

That under and by its lease and license, the American Bell Telephone Company did not grant to the defendant, but has retained the sole and exclusive right to use within the territory to which said license extends, the said patented inventions, and the leased instruments and other appliances to perform any and all part of the work of transmitting messages by electricity from the private offices and residences of the subscribers, to points outside said territory; that in order to perform said service in a manner more economical, more efficient, and more beneficial to the

subscribers, the American Bell Telephone Company has appointed the Western Union Telegraph Company (a telegraph company having a public office in Bridgeport, and whose lines reach to or connect with all parts of the world), to perform part of said work; that the lines and operators of said telegraph company do perform part of said work, and that the American Bell Telephone Company receives a portion of the compensation paid by the public for said service; that furthermore it has in and by said license been agreed between the American Bell Telephone Company and the defendant that the lines, apparatus, central office and operators of the defendant, shall be employed to perform part of said service of transmitting messages to extra-territorial points, and that a line built and owned by the American Bell Telephone Company, extending from the central office of the defendant to the office of said Western Union Telegraph Company in said Bridgeport, shall be employed for another part of said service, and that the American Bell Telephone Company will pay to the defendant therefor a certain portion out of the total compensation which it receives for each such message.

That the defendant is entirely willing and hereby offers to furnish to the plaintiff its patented instruments and suitable connections with its central office under the same license which is granted to other customers to be used as therein expressed, but not otherwise; but that the plaintiff wishes to use them for transmitting such extra-territorial telegraphic messages, and for a toll or consideration to be paid by persons other than itself, and for performing part of the work of collecting, transmitting and delivering messages in respect of which toll or consideration is to be paid to persons other than the exchange and for transmitting market quotations and news for sale or publication, and for performing services in competition with the services which the exchange undertakes to perform; some of which uses are not included in the right granted to the defendant by the American Bell Telephone Company, and all of which are forbidden to the customers of the defendant; and that

the plaintiff desires to use said instruments for its own profit; and that such uses so desired and intended differ in character from and in amount far exceed the use made by other licensees and customers of the defendant and defined in its license.

So the defendant says—1st. That it has no power to furnish the patented instruments, facilities and connections asked for by the plaintiff.—2d. That if said instruments, facilities and connections shall be so furnished upon the same terms as are paid by private and individual customers, the American Bell Telephone Company will lose the profits and revenues which it is entitled to receive for the use of its patented inventions for the transmission of extra-territorial messages, and the defendant will lose the compensation agreed to be paid to it by the American Bell Telephone Company for the part of said service performed by it as aforesaid, the right to earn which was one of the causes which led it to expend its money in the erection of this exchange system.—3d. That the plaintiff will obtain all the advantages and benefits which private subscribers have, for the same price usually paid by them for such advantages and rights, and further and different advantages and profits of great value from the use of the patented inventions, and the apparatus and wires, and central office, and employment of operators there, without paying any compensation whatever therefor.

The contract between the American Bell Telephone Company and the Connecticut Telephone Company, set up in the answer of the defendant, contained among others the following clauses:—

" (2.) The rights hereby granted shall remain in force until the first day of May, 1888, unless sooner determined as hereinafter provided, and shall extend to all exchanges established and owned by the licensee within the present municipal limits of the city of Bridgeport, in the county of Fairfield, and state of Connecticut." (Extended by a later clause to sundry towns in Fairfield county.)

" (3.) For the purpose of this contract a telephonic ex-

change system means a system, entirely within said territory, in which different circuits are connected with a central or branch office of the exchange, attended by an agent of the exchange, for the purpose of placing subscribers or other parties by such circuits in telephonic communication with such central or branch exchange office, or with each other, either directly or through the agents of the system. No office or line of an exchange can be connected with any point outside of said territory, nor with any telegraph company's office or line, except by lines of the licensor or parties specially designated by it for this purpose, and no telegraph company, unless specially permitted by the licensor, can be a subscriber or use the system to collect and deliver messages from and to its customers."

" (7.) The contract between the exchange and those who are to use telephones under it shall express in such form as the lessor shall from time to time approve, that the telephone is the property of the licensor; that it is leased and licensed by it only as herein expressed; that all use of it otherwise is an injury to and invasion of the rights of the licensor as owner thereof and of the patent rights used therein and thereby, entitling it to all the remedies herein provided and to an injunction, and other legal redress, in a suit by it in its name and behalf."

The act of the legislature of Massachusetts, incorporating the American Bell Telephone Company, was passed in the year 1880, and contained the following clauses:—

[The corporators named] may associate themselves and organize a corporation according to the provisions of chapter 224 of the acts of the year 1870, and the acts in amendment thereof and addition thereto, for the purpose of manufacturing, owning, selling, using and licensing others to use, electric speaking telephones and other apparatus and appliances pertaining to the transmission of intelligence by electricity, and for that purpose constructing and maintaining by itself and its licensees public and private lines and district exchanges, with a capital stock exceeding one million of dollars, and not exceeding ten millions of dollars.

\* \* And it and its licensees may, within this common-wealth, enjoy the rights given by chapter sixty-four of the General Statutes and acts amendatory thereof, and shall be subject to the liabilities therein imposed; but section ten of said chapter shall only apply to their public lines."

The tenth section of the statute of Massachusetts here referred to is as follows:—" Every company shall receive dispatches from and for other telegraph lines, companies and associations, and from and for any person; and on pay-ment of the usual charges for transmitting dispatches, according to the regulations of the company, shall transmit the same faithfully and impartially."

The plaintiff demurred to the defendant's answer, and the court (*Torrance, J.,*) held it sufficient and dismissed the plaintiff's application. The plaintiff then brought the case before this court by a motion in error, assigning as error that the court held—1. That the defendant, as a pub-lic corporation of the state of Connecticut, was not bound to furnish equal facilities to the entire public without dis-crimination. 2. That the American Bell Telephone Com-pany, as a public corporation of the state of Massachusetts, was not bound to furnish equal facilities to the entire public without discrimination. 3. That the restriction in the con-tract of that company with the defendant was not contrary to the public policy of the state of Massachusetts, to the charter of that company, and to the laws of that state. 4. That the restriction was not contrary to the public policy of this state, the charter of the defendant, and the laws of the state.

*A. S. Treat* and *C. Sherwood*, for the plaintiff.

1. The defendant is a public corporation of the state, and in duty bound to furnish equal facilities to the entire public without discrimination. It is engaged in a public employment. It advertises itself as ready to serve all who apply. It is a public servant and lives on public patronage. It holds itself out as ready and willing to furnish instru-ments and wires connected with the exchange to all who

may apply, and for a like compensation to all. In consideration of this public benefit the authorities have given it the right to use the public highways, to erect poles and construct a net-work of wires to constitute an exchange. This right was granted in consideration of the service which it proposed to render the public. For these privileges it owes the public a duty. That duty is to serve the public indifferently. It bears to the public, then, the same relation as does a common carrier, and is governed by the same principles of law applicable to common carriers. "A common carrier is a public carrier. He engages in a public employment, takes upon himself a public duty, and exercises a sort of public office. He is under a legal obligation; others have a corresponding legal right. His duty being public, the correlative right is public. The public right is a common right, and a common right signifies a reasonably equal right." *McDuffie* v. *Portland & Rochester R. R. Co.*, 52 N. Hamp., 447. The duty of a common carrier to the public is one of law, growing out of the nature of the employment, and not of contract. Redf. on Carriers, 30, 37, 38.

2. If the defendant resembles a common carrier in its treatment of the public, it cannot enter into a contract with another person or corporation whereby it can legally refuse the application of the plaintiff as one of the public. Such a restrictive contract would be void, as against public policy. "Common carriers are bound to carry, indifferently, within the usual range of their business, for a reasonable compensation, all freight offered, and all passengers who may apply. For similar equal services they are entitled to the same compensation. All applying have an equal right to be transported, or to have their freight transported, in the order of their application. They cannot legally give undue and unjust preference or make unequal and extravagant charges. Having the means of transportation, they are liable to an action if they refuse to carry freight or passengers without just ground for such refusal." *N. England Express Co.* v. *Maine Central R. R. Co.*, 57 Maine, 194, 196.

" The proprietors of a stage coach who hold themselves out as common carriers of passengers, are bound to receive all who require a passage, so long as they have room, and there is no legal excuse for a refusal. It is not a lawful excuse that they run their coach in connection with another coach which extends the line to a certain place, and have agreed with the proprietors of such other coach not to receive passengers who come from that place on certain days unless they come in his coach." *Bennett* v. *Dutton*, 10 N. Hamp., 481. In the following case a railroad company agreed to give exclusive privileges to an express company, and the court said :—" The railroad corporation has no right to do this. The power to regulate the transportation on the road does not carry with it the right to exclude any particular individuals, or to grant exclusive privileges to others. * * Such a power in a railroad corporation might produce evils of a most alarming character. * * The rights of the people are not subject to any such corporate control. Like the customers of a grist mill, they have a right to be served, all other things equal, in the order of their applications. A regulation to be valid must operate on all alike. If it deprives any persons of the benefits of the road, or grants exclusive privileges to others, it is against law and void. * * An express company engaged in the business of transporting small packages has as good a right to the benefits of the railroad as the owners of the packages possessed in person. It is impossible that they can all appear in person to claim their rights, and it is sufficient that they are represented by agents who are intrusted with their goods and have a special property in them." *Sanford* v. *Railroad Co.*, 24 Penn. St., 381. The same principles of law are approved and strongly illustrated in the case of *Munn* v. *Illinois*, 94 U. S. Reps., 113, in which the U. S. Supreme Court holds that the large elevators at Chicago are quasi public institutions and their employment of a public character, and that by reason of their employment they are subject to legislative control in their charges and bound to treat all alike. The same doctrine is laid down in *Winona*

*&* *St. Peter R. R. Co.* v. *Blake,* 94 U. S. Reps., 180; *N. Jersey Nav. Co.* v. *Merchants' Bank,* 6 How., 382; *Vincent* v. *Chicago & Alton R. R. Co.,* 49 Ill., 33; *Chicago & N. Western R. R. Co.* v. *The People,* 56 id., 365; *Chicago & Alton R. R. Co.* v. *The People,* 67 id., 22; *People* v. *Albany & Vermont R. R. Co.,* 24 N. York, 269; *Southern Express Co.* v. *Iron Mountain R. R. Co.,* (to appear in 2 McCrary); *Texas Express Co.* v. *Texas & Pacific R. R. Co.,* 24 Albany Law Journal, 35; *State* v. *Hartford & N. Hav. R. R. Co.,* 29 Conn., 538.

3. If there can be any doubt of the resemblance between the defendant company and the kinds of common carriers above mentioned, the medium employed being so unlike, there certainly can be none of the resemblance between it and telegraph companies, the medium employed being the same. Both are carriers of intelligence, and both use wires and the appliances and inventions relating to electricity and magnetism; the difference being that in the one case a person uses the wires and appliances directly; in the other, through certain persons as his agents. But telegraph companies are now regarded as common carriers and governed by the same general rules. 2 Parsons on Cont., 251; *MacAndrew* v. *Electric Telegraph Co.,* 17 C. Bench, 3; *Parks* v. *Alta Cal. Telegraph Co.,* 13 Cal., 422. In the last case the court says:—" The rules of law which govern the liability of telegraph companies are not new. They are old rules applied to new circumstances. Such companies hold themselves out to the public as engaged in a particular branch of business, in which the interests of the public are deeply concerned. They propose to do a certain service for a given price. There is no difference in the general nature of the legal obligation of the contract between carrying a message along a wire and carrying goods or a package along a route. The physical agency may be different, but the essential nature of the contract is the same." Again, in *DeRutte* v. *N. York &c. Telegraph Co.,* 1 Daly, 547, the court says:—" The business of transmitting messages by means of the electric telegraph is like that of common carriers, in the nature of a

public employment, for those who engage in it do not undertake to transmit messages only for particular persons, but for the public generally." See also *Western Union Tel. Co.* v. *Neill*, 24 Albany Law Journal, 409.

4. But the precise questions under discussion in this case have been considered and decided by some of the courts in this country. In *Am. Union Telegraph Co.* v. *Bell Telephone Co.*, 10 Central Law Jour., 438, the telegraph company had applied, as we have done, to the telephone company for an instrument to be placed in its office. The telephone company refused, as in this case, and the questions arose as here, on a mandamus. Judge THAYER, giving the opinion of the court, said:—" The principles of law applicable to railroad companies and other common carriers unquestionably apply to telegraph and telephone companies. Having established their lines and adopted a uniform mode of serving the public consistent with their chartered powers, they must treat all persons similarly situated with respect to those lines alike, and without unjust discrimination. It is not for them to select whom they will serve, or impose conditions of service on one class of customers that do not apply equally to all persons occupying the same relative position toward the company. * * If it erects its main line along a certain street or streets under a power granted in its charter to use public highways for that purpose, and under a charter granting it the power to condemn land for the construction of a telephone line, and if it elects to serve the public by furnishing instruments to residents along such line for private use, and by making connections between such instruments and its main lines; above all, if it holds itself out to the public as prepared to furnish such instruments and make such connections for all who may apply, then I should say that its duty to the public compels it to treat all residents along such line with absolute impartiality. It cannot grant such facilities or render such service to one citizen or corporation and refuse like privileges to his next door neighbor. * * It follows, from the principles above stated, that in refusing to grant to the relator such facilities

as it affords to other customers, it has violated an imperative
duty imposed upon it by law." The case is again referred
to in 11 Central Law Jour., 359. It seems that upon
further proceedings being had the respondent set up as a
defense the same license or contract as is here relied upon
by the defendant, but the court adhered to its former opin-
ion, and held that such discrimination was contrary to law
and public policy; and that a public servant, as the respon-
dent was, could not avoid the performance of any part of
the duty it owed to the entire public by any contract obli-
gation which it might enter into, even with the patentee of
an invention. The same question again came up in the
Kentucky Chancery Court in the case of *Louisville Transfer
Co.* v. *Am. District Telephone Co.*, 24 Albany Law Jour.,
283. The plaintiffs were proprietors of public carriages and
the defendants were a telephone company and also proprie-
tors of public carriages. The court said:—" The real con-
tention between the plaintiffs and defendants is confined to
their carriage services; the defendants insisting that as
against the plaintiffs, rivals in that business, they have a
right to a monopoly in the use of their own telephonic
methods of communicating and receiving orders for carriers;
that a mere rival in one branch of their business cannot
force them to afford him the facilities which they have pro-
vided for another branch of their business. Upon the facts
appearing upon the petition and affidavits of the plaintiffs
it is the opinion of the court that the defendants are engaged
in two distinct employments—one operating a telephonic
exchange and the other operating a carriage service. They
are not rivals in the former business, and as to that part of
the defendants' business they occupy the same position
towards the plaintiffs as they do towards the rest of the
public. The defendants are a *quasi* public servant, and as
such are bound to serve the general public, including the
plaintiffs, on reasonable terms, with impartiality. They are
governed by the principles of the law of common carriers.
\* \* The principles announced in an opinion by Judge
THAYER, in *Am. Union Telegraph Co.* v. *Bell Telephone Co.*

should determine this controversy." This court can safely follow the principles so ably presented in the foregoing cases.

5. The defendant has, by the laws of this state, a statutory obligation toward the plaintiff, as well as one of common law. Section 8, p. 342, of the Revision of 1875, as amended by Session Laws of 1879, chap. 36, reads as follows:— " Telegraph or telephone companies shall receive dispatches from any person and from other telegraph or telephone lines, and shall transmit them in the order of time in which they are received, on payment of the usual charges." It is bound to receive and transmit our dispatches. The fair inference is that it is bound to enable us to receive and send them by furnishing proper facilities.

6. The American Bell Telephone Company is a public corporation of the state of Massachusetts. The principles of the law of common carriers already discussed apply thereto with equal force. The contract for exchanges made with the defendant violates the charter of that company. It is also contrary to and violates the statute laws of that state. Section 10, chapter 64, of General Statutes of Massachusetts, to which by the charter that company is made expressly subject, relates to telegraph and telephone companies, and reads as follows:—" Every company shall receive dispatches from and for other telegraph lines, companies and associations, and from and for any person ; and on payment of the usual charges for transmitting dispatches, according to the regulations of the company, shall transmit the same faithfully and impartially." This and the Connecticut statutes are substantially the same, and follow the English general statute relating to telegraph companies.

7. This is a new question before this court, and, indeed, before any court of last resort in this country, but no new principles are involved in its determination. It is the grand quality of our system of jurisprudence that it is elastic and can and will adapt itself to the changing conditions and circumstances of modern civilization. If there are no established precedents, it will not hesitate to create such as are suited to the necessities of the case.

*J. S. Beach* and *M. F. Tyler*, for the defendant.

1. Let us first consider the nature of our relations to the licensor and what they involve. We are licensees, or grantees of a well-recognized kind of property, a patent right. *Seymour* v. *Osborne*, 11 Wall., 533; *Wilson* v. *Rousseau*, 4 How., 674. The essence of this property is its exclusiveness. *Bloomer* v. *McQuewan*, 14 How., 549; *Seymour* v. *McCormick*, 16 id., 480. It has the recognized division, as regards the patented article, into the right to manufacture, to sell, and to use. *Adams* v. *Burke*, 17 Wall., 453. It is only the pecuniary advantage of the patentee that shall determine how he will use his right. Any portion of this right can be disposed of at pleasure, and subject to the will of the patentee. When so disposed of, the right is still under federal control. *Mitchell* v. *Hawley*, 16 Wall., 550. In such a grant, narrowness of license is matter of substance, and the licensee has no right other than that granted in the license. *Stephens* v. *Cady*, 14 How., 528; *Stevens* v. *Gladding*, 17 id., 447. The American Bell Telephone Co., in the exercise of its exclusive right, has licensed the defendant in the limited territory of Bridgeport, to use the inventions and patented instruments for certain limited and specified purposes, and uses which do not include that use which the plaintiff will make of them if its application is granted. The franchise secured by the patent holds the licensee under the operation of the patent, and restrains all use beyond that which the licensor has granted by the express terms of the license. The federal courts would enjoin the licensee from such extended use. No case exists where the use of a patent has been allowed against the will of the patentee; and in no case has public policy been substituted for such permission, or been admitted as a justification of such permission. Government itself cannot use. *Allen* v. *Mayor &c. of N. York*, 7 Fed. Rep., 483; *Campbell* v. *James*, 18 Pat. Office Gaz., 300, 980, 1116; *Cammeyer* v. *Newton*, 94 U. S. Reps., 234; *Colgate* v. *Western Union Telegraph Co.*, 15 Blatchf., 365. On the contrary, licenses with many and varied limitations

have been sustained by the courts. *Wilson* v. *Rousseau*, 4 How., 674; *Rubber Co.* v. *Goodyear*, 9 Wall., 788; *Seymour* v. *McCormick*, 16 id., 480; *Brooks* v. *Byam*, 2 Story, 525; *Emigh* v. *Chicago, B. & Q. R. R. Co.*, 2 Fish. Pat. Cas., 387. All decisions go to maintain in the patentee an absolute property controlled only by his own pecuniary interest. To these considerations are to be added the fact that this franchise is of federal origin; that it is still under the control of federal courts and federal legislation. This federal control is exclusive, in analogy with the control of commerce. *Freight Tax Cases*, 15 Wall., 232, 279; *Cooley* v. *Port Wardens*, 12 How., 299. Does the exchange come under rules that govern property devoted to special uses? This cannot be, for the patented article is issued by the licensor, and cannot have been devoted to public use, for it has never passed out of the control of the patentee. The defendant has not devoted that part of the patent right concerned to public use, for it has never owned it. Its estate is only that of lessee for a term of years. But, were the rights of the exchange devoted to public use, even as claimed by the plaintiff, it would not affect this case. The doctrine of the cases on this topic, such as *Munn* v. *Illinois*, 94 U. S. Reps., 113, rests upon the ground of voluntary dedication. " There is no attempt to compel these owners to grant the public an interest in their property, but to declare their obligations if they use it in this particular manner." This doctrine operates upon only such property as is so dedicated, and does not operate to increase the amount or scope of the original grant to the public. Nor does it give the state authority over matters confided exclusively to federal authority. The exchange does not come under the rule that governs common carriers. This rule is that they are bound to do that which they make public profession of doing. *Johnson* v. *Midland Railway Co.*, 4 Exch., 367; *Oxlade* v. *N. Eastern Railway Co.*, 15 C. Bench., N. S., 680; *Citizens' Bank* v. *Nantucket Steamboat Co.*, 2 Story, 16; *Dunn* v. *Grand Trunk Railway Co.*, 58 Maine, 187; *Lucas* v. *Milwaukee & St. Paul R. R. Co.*,

33 Wis., 41; *Illinois Central R. R. Co.* v. *Nelson*, 59 Ill., 112; *Same* v. *Johnson*, 67 id., 314; *Arnold* v. *Ill. Central R. R. Co.*, 83 id., 273. What the *exchange* holds out to the public, what it professes to do, is in the license and subscribers' contract. What the *patentee* professes to do is in the various licenses. The exclusive right under federal law to do a certain thing the patentee has seen fit to sell to one party, while selling other and different rights to several parties. But we maintain that so far as exchange subscribers are concerned, the exchange is not a common carrier. It offers to perform a certain service for a definite body of customers. The public has no right of access to one of the exchange stations. They are not public offices. The fact that the service is a great convenience, and is largely used, does not render it a public service. The case of *McCune* v. *Norwich City Gas Co.*, 30 Conn., 521, is analagous. Similar are also the rulings regarding the obligations of railroads to lay side tracks, and furnish express and baggage facilities. *Sargent* v. *Boston & Lowell R. R. Co.*, 115 Mass , 416; *Barry* v. *Oyster Bay &c. Steamboat Co.*, 67 N. York, 302; *The Martin*, 11 Blatchf., 233; *Jencks* v. *Coleman*, 2 Sumn., 221.

2. The state statute invoked does not touch this case. By its terms it supposes a public office, accessible to all. The exchange is in no sense a connecting line, for it is working under a different system, under patents not applicable to the telegraph business. But if we do offend the statute, a remedy is pointed out in the statute itself, and that is the one that should be applied.

3. No demand of "public policy" required the court to sustain the plaintiff's demurrer. This phrase is a vague and expansive one. Certain contracts, as those in restraint of trade, or of marriage, or founded on maintenance or wagers, are said to be against public policy, and cannot be enforced. There is another class of cases in which the doctrine of public policy is invoked as against corporations, to compel them to do certain acts by mandamus, or to prohibit certain acts by injunction. In *State* v. *Hartford & N. Haven R. R.*

*Co.*, 29 Conn., 538, this principle was applied to compel the company to extend its road to tide water, as against its agreement with another road that it would not so extend it. But in this and in all other similar cases, the element essential to the theory of public policy and its enforcement, was the omission and refusal by the corporation to do something beneficial to the public, which its chartered powers not only empowered but obligated it to do. There is no such element in this case. The chartered powers of the defendant are derived from the general joint stock act, and the charter by its terms limits it to the use of " systems of telephone exchange." The defendant has made no contract in restriction of its chartered powers. It has not omitted or refused to give to the public, or to the plaintiff, as one of that body, all the facilities which its chartered powers permit it to give. So that the court below was clearly right in overruling the demurrer, unless some new and broader theory of public policy can be found and made applicable. Such theory, and its infraction by the defendant, is by the assignment of errors said to be involved in the allegation that " the said restrictions in said contract or license are against public policy." The license to the defendant is restricted—1st, in duration ; 2d, territorially ; 3d, to the application of the patented mechanism to this system known as the " exchange system." The subject matter of this license, then, is the right to use, for certain defined purposes, certain described mechanism by which the sound of the human voice may be projected beyond the limits within which its natural tones can be heard. The plaintiff's theory seems to be, that the lawful owners by federal grant of the exclusive right to use this mechanism, become, by licensing its use within any given territory, common carriers of sound within that territory, and therefore forbidden by the policy of the law to impose any restrictions upon the licensee as to the use he may make of the patented mechanism. We submit that the mere statement of this theory bears upon its face its own refutation. It is a misapplication of the doctrine of public policy as applied to common carriers, and

as illustrated by the authorities cited by the plaintiff. The public did not confer upon this company any right to this mechanism. It could not confer it. The public did not own the property. It was not included under its title of eminent domain. Neither could the public compel those who did own the property, to part with it to the defendant, except upon their own terms. The defendant, therefore, was compelled to go, and did go, elsewhere to obtain this property, and by contract with its lawful owners, secured a license to use it for a limited period, within a limited territory, and for a limited purpose. While it is true that this defendant, as a corporation, derived the power to make this as well as every other contract from the public, it is not true that it acquired that power by any exceptional grant of power from the public to that end. After becoming a corporate entity, it had the right in common with the public at large to contract for and purchase this property. The power of this corporation, and that of every individual in the community, so far as related to the subject matter of this contract, had the same measure and limit. This consideration of itself closes the door of the court against an applicant who claims that the defendant is the recipient of powers under a grant from the public of such a character that a pretended policy can intervene in the alleged interests of the public to compel the defendant to break and thereby forfeit its contract. In the language of the Master of the Rolls, in *Printing Co.* v. *Sampson*, L. Reps., 19 Eq., 462: "If there is one thing which, more than another, public policy requires, it is that contracts shall be held sacred, and shall be enforced by courts of justice."

PARDEE, J. In March, 1876, A. G. Bell became the patentee of the magnetic telephone, a mechanical device capable of transmitting articulate speech through wires by the power of magnetism and electricity; others subsequently became patentees of various improvements upon it and of appliances to be used therewith; and the American Bell Telephone Company, a corporation chartered by, and

having its legal location in the state of Massachusetts, became the owner of these several patents.

In May, 1880, the Connecticut Telephone Company was organized as a joint stock corporation in and under the laws of the state of Connecticut, for the purpose of building, owning, and operating systems of telephonic exchange therein. In February, 1881, it purchased from the American Bell Telephone Company the privilege of using, upon conditions and under limitations, certain of its magnetic telephones for the period of seven years within the limits of the city of Bridgeport, in a telephonic exchange system to be there established; the instruments to continue to be the property of the American Bell Telephone Company, and a stipulated rent to be paid for the right to use each one.

The answer, among other things, alleges that the contract by which the Connecticut Telephone Company acquired from the American Bell Telephone Company the right to use its instruments, prohibits the former from allowing any such instrument placed outside of the limits of said city to be put in communication, either with the instrument in the central office or with that of any subscriber within the city, and from allowing any telegraph company to use the system of telephonic exchange for Bridgeport for the purpose of receiving from its customers messages to be sent, or delivering to them messages which have been sent over its wires, unless such telegraph company has purchased from the American Bell Telephone Company the right to use that system; that the Western Union Telegraph Company has purchased from that company the right, exclusive of all other telegraphic companies, to use every telephonic exchange system which may be established in the United States under the patents of the American Bell Telephone Company in connection with their business, and now uses and has the right to use the defendant's system in Bridgeport, to the exclusion of the plaintiff; and that the defendant does not own and therefore cannot give to the latter the right which it demands.

The plaintiff insists that the defendant has offered its

services to the public as a common carrier of articulate speech; that it has thereby made itself the servant of the public and has subjected itself to the operation of the general law which compels all such servants to serve applicants impartially, regardless of the limitations placed upon its use of the instruments. But the property of the American Bell Telephone Company in its patent is absolute and exclusive; it can rent or sell it in whole or in part; it can refuse to make or use, or to allow any one else to make or use, the telephone described in it; or it can make and sell one and no more, and put such restrictions as it pleases upon the time, place and manner of using that; and it was the privilege of the Connecticut Telephone Company to purchase from it even the most limited right to use one or more of its instruments, and it is not within the power of the court either to enlarge or diminish the purchase.

In this respect the position of the Connecticut Telephone Company is quite unlike that of railroad companies which have in the exercise of their respective franchises voluntarily undertaken by contract to put limitations upon the use of property absolutely their own and discriminate in favor of certain applicants for transportation; unlike that of proprietors of grain elevators, who have been declared to be warehousemen and as such to have brought themselves within the power of the legislature to regulate their tolls and compel them to render impartial service to applicants for storage; and unlike that of railroad companies which have undertaken to bind themselves by contract not to do in behalf of the public the service, the doing of which was the consideration upon which they received valuable franchises. The record does not show that the defendant ever exercised the right, or declared to the public that it had the right, to use the telephonic instruments upon any other terms than such as are strictly conformable to the measure of use granted to it by the owner of them; does not show, and we may not assume, that it failed to purchase the largest possible measure; and does show that it has offered that measure to the plaintiff.

Neither by availing itself of the right to organize as a joint stock corporation in this state, or of the right granted by statute to all telephonic proprietors to carry wires upon poles set in the public ways, nor even by taking from the legislature of this state the most unlimited franchise, can the defendant draw to itself the right to any use of the telephones belonging to the American Bell Telephone Company in excess of the grant. The citizens of this state cannot deprive the latter of its property in its patent simply by investing the Connecticut Telephone Company with a franchise to convey speech, nor compel the latter to sell to the plaintiff rights which it does not possess.

A statute of this state provides in effect that every telephonic company shall with impartiality permit persons and corporations to transmit speech through its wires by its instruments. The utmost reach of this is to require them to make an impartial use of such rights or privileges as they possess. If their system is carried into effect by instruments which are not the subjects of a patent and they so conduct their business as to become common carriers of speech, they are to serve applicants with impartiality; or if it is carried into effect by patented instruments, of which patents they are the owners, the same result is to follow; but, if it is carried into effect by instruments which are the subjects of a patent which is the property of a resident of another state, and from whom they are able to purchase, not the instruments themselves, but only a right to the temporary use thereof, subject to conditions and limitations, they are only required to give impartially to applicants the use of the full measure of the right which they have been able to procure. The statute cannot confer power upon courts, either to order them to buy that which cannot be bought or to use the property of another without his consent. The legislature may deny the use of highways for the erection of poles for the support of wires to any corporation which is not the full owner of the telephonic patents by which its system is operated, and which is not able to give a perfectly unrestricted and

impartial use of all their capabilities to applicants, or to any corporation which proposes to use telephonic patents under any restrictions whatever imposed by the owner; and so embarrass and hinder as to induce them to become full owners of such patents or retire from the service of the public. Legislatures for reasons of public policy in many ways put limitations upon absolute owners in the use of their property; but they cannot transfer the property of one to another without compensation even for the public good.

Again, the American Bell Telephone Company is located in another state; it has not been made nor of itself become a party to this proceeding; has not submitted itself to the jurisdiction of our courts. By leasing certain of its patented instruments to be used in this state under limitations, it did not surrender its invention to the public use here, nor here become a common carrier of speech, nor expose itself to the power of our courts to determine that it had forfeited the exclusive ownership of its patent in behalf of its limited lessee. Nor was it in the power of that lessee to confer authority upon our courts to confiscate, either in its behalf or in behalf of the public, the reserved rights of its lessor, by bringing its fragmentary right into this state and devoting it to the service of the public.

The owner of a patent who leases for a limited term, upon conditions and under restrictions, an instrument or piece of mechanism covered by that patent, cannot, as the result of the lessee's manner of use thereof, be subjected to the law governing common carriers or public servants, so as to be concluded by a judgment that he has dedicated his patent to the public and forfeited his reserved rights in it.

If the lessee, the Connecticut Telephone Company, so uses its rights here as to subject itself to the operation of that law and offends it, the court will stop the misuse of its limited rights; but the decree will not reach beyond those rights; will not transfer to it any property or rights to the use thereof which it has not purchased.

It is said further, that in incorporating limitations and

restrictions in its lease of its instruments to the Connecticut Telephone Company, the American Bell Telephone Company has violated a statute of the state which incorporated it and where it has its existence. That statute is in effect the same as our own, previously cited. But the American Bell Telephone Company is the owner of letters patent for an electric speaking telephone, and of course has the right to manufacture and sell or lease the instruments. It has also legislative permission to extend lines of wire within the state of Massachusetts for conveyance of articulate speech for compensation. It is to the company in this last capacity, and within that state solely, that the statute applies. It does not affect its right as the owner of an instrument to lease it to a citizen of another state upon conditions; nor does it affect the right of such citizen to hire it under limitations; he assuming the risk of being denied the privilege of using his limited right within his own state.

There is no error in the judgment complained of.

In this opinion the other judges concurred.