WESTERN UNION TELEGRAPH COMPANY & another *vs.* CALVIN H. FOSTER & others.

PUBLIC SERVICE COMMISSIONERS *vs.* WESTERN UNION TELEGRAPH COMPANY & another.

Suffolk.   January 25, 1916. — June 19, 1916.

Present: RUGG, C. J., DE COURCY, CROSBY, PIERCE, & CARROLL, JJ.

*Telegraph Company.   Ticker Service.   Public Service Commission.   Carrier,*
Of messages, Discrimination.   *Practice, Civil,* Parties.   *Interstate Commerce.*
*Constitutional Law.*

Under St. 1913, c. 784, § 2 *c*, the public service commission have power, by an order
   passed by them to that effect, to compel a telegraph company doing business in
   this Commonwealth to furnish to a person properly applying for them quota-
   tions of the sales upon the New York Stock Exchange by means of a ticker serv-
   ice on the same terms that such quotations are furnished by it to other persons,
   although in the contract between the New York Stock Exchange and the tele-
   graph company under which the quotations are obtained by that company it
   is provided that such quotations shall not be furnished to any subscriber unless
   "the subscriber shall have been approved by the exchange" and the person in
   question was not approved by the exchange as a subscriber.
In a proceeding under St. 1913, c. 784, § 28, by the public service commissioners to

enforce the order of the commission above described it is not necessary that the New York Stock Exchange or its officers and members should be made parties, as, whatever their interest in the subject matter may be, the proceeding deals only with the rights acquired by the telegraph company in the quotations.

In the decision stated above it was *pointed out* that the contract between the New York Stock Exchange and the telegraph company which was in force when the order of the public service commission was issued was made when St. 1913, c. 784, was in effect.

Although the sending of stock quotations by the New York Stock Exchange to a telegraph company at its place of business in Boston is interstate commerce, yet the furnishing of such quotations by the telegraph company to its customers or patrons in its ticker service at their Boston offices is domestic business and is analogous to selling at retail in the local market a commodity purchased at wholesale outside the Commonwealth. Consequently the federal interstate commerce act does not apply to such ticker service and it is subject to the law of this Commonwealth.

TWO PETITIONS, the first filed in the Supreme Judicial Court on September 27, 1915, under St. 1913, c. 784, § 27, praying that an order made by the public service commission on September 7, 1915, might be reviewed, annulled, modified or amended, the order referred to being as follows:

"It appearing that the Gold and Stock Telegraph Company, by the Western Union Telegraph Company, lessee, and the United Telegram Company have without just cause denied, and refused to supply to Calvin H. Foster the continuous quotations of the New York Stock Exchange by means of ticker service now furnished and supplied to others, said denial of service is held to constitute an unjust and unlawful discrimination, and it is

"Ordered, That the Gold and Stock Telegraph Company, by The Western Union Telegraph Company, lessee, and The United Telegram Company shall forthwith remove said discrimination;"

And the second petition filed in the same court on October 15, 1915, under § 28, of the same statute by the public service commissioners against the Western Union Telegraph Company, a corporation organized under the laws of the State of New York and having a usual place of business in the Commonwealth, and the United Telegraph Company, a corporation organized under the laws of the State of New Jersey and having a usual place of business in the Commonwealth, praying for a mandatory injunction ordering the respondents to comply with the order quoted above.

The cases were consolidated by an order of the court and there-

after came on to be heard by *Pierce,* J.   Whereupon, no issue of fact being raised by the pleadings and no evidence being offered by either party, all questions of law involved were reserved by the justice upon the pleadings for determination by the full court.

*A. Lord & R. Taggart* (of New York), for the Western Union Telegraph Company and the United Telegram Company.

*H. W. Barnum,* Assistant Attorney General, for the public service commission.

*P. H. Kelley,* (*J. L. McLean* with him,) for the respondent Foster.

*H. S. Robbins* (of Illinois), for the Chicago Board of Trade, by permission of the court submitted a brief.

*W. F. Taylor* (of New York), for the New York Stock Exchange, by permission of the court submitted a brief. ·

RUGG, C. J.   These cases arise under St. 1913, c. 784.   In substance the petition by the Western Union Telegraph Company and the United Telegram Company seeks a review and annulment of an order of the public service commission, while the public service commission by its petition seeks enforcement of such order. This order is designed to prevent unfair and unjust discrimination by the telegraph companies.   The statute confers upon the public service commission ample powers to that end.   It also clothes the Supreme Judicial Court with jurisdiction to review, modify, or amend unlawful rulings and orders of the commissioners and to enforce its valid orders.   §§ 2, 20, 27, 28.

The material facts are that the telegraph companies are furnishing to brokers and others in Boston continuous ticker quotations of transactions upon the New York Stock Exchange, which they are enabled to do by means of contracts between the telegraph companies and the New York Stock Exchange.   The stock exchange is a voluntary association with its place of business in New York. Quotations of sales of stock on the New York Stock Exchange are collected by employees of the exchange, and, for a substantial consideration, furnished to each of the telegraph companies in New York under contracts which permit them to "furnish said quotations, or any part thereof, or any information therein contained, to its patrons by means of tickers, or by telegraph or telephone wires and instruments . . . subject to the limitations, conditions and provisions hereinafter contained," one of which is that such quotations shall not be furnished "to any subscriber thereof unless the sub-

scriber shall have signed in duplicate an application therefor addressed to the Telegraph Company, and the subscriber shall have been approved by the Exchange," the intent of which is declared to be "only to prevent the unlawful or improper use of such quotations." The quotations are collected and delivered almost moment by moment as the sales occur during business hours on the stock exchange. The quotations as thus received in New York are transmitted as soon as may be by each of the telegraph companies to its Boston office. Each of the telegraph companies has a main office in Boston, where there are electrical appliances connected by a system of cables and wires under and across public ways with ticker instruments in the offices of its patrons. The quotations received from New York are delivered into the main Boston office in the Morse code over ordinary telegraph wires. Forthwith an employee operating a keyboard causes them to be written simultaneously by means of ticker instruments upon a tape of paper in the office of each patron, where they can easily be read. The result is that the quotations are reported on the ticker as the sales are made and within a brief time thereafter.

Foster applied to each company for this ticker service upon application forms prescribed by the contracts between the stock exchange and the telegraph companies, which were transmitted by each company to the stock exchange for its approval. The stock exchange did not approve the applications and the telegraph companies refused to install the ticker service. Foster thereupon applied to the public service commission to be furnished with the service. He alleged in his petition that he had been engaged for a long time in the stock brokerage business in Boston, had previously been furnished with tickers, which were removed in 1914; that he had applied for a renewal of the service, had appeared before the appropriate committee of the New York Stock Exchange on two different occasions where he had submitted himself to examination and answered all questions asked; that in conducting his business he always has complied with the laws of this Commonwealth, and does not desire the quotations and ticker service for any unlawful or improper purpose, but for use in his legitimate brokerage business, which will suffer irreparable injury if he is unable to procure it. These allegations were not denied before the commission and cannot be challenged seriously here. The com-

mission found that the petitioner was ready and willing to pay the price charged to other patrons of the telegraph companies for ticker service, and to comply with all reasonable rules and regulations, and that the telegraph companies simply had been notified that the exchange had disapproved the petitioner's applications, without stating any reason.   The commission found that there was no evidence that the petitioner desired the quotations for unlawful or improper use, and that the telegraph companies were guilty of unjust and illegal discrimination in that, without just cause, they denied and refused to supply to Foster the quotations of the stock exchange by means of ticker service, and ordered the companies forthwith to remove such discrimination.   The cases must proceed upon the footing that these findings of fact are true.

The quotations, when collected and tabulated by the exchange, constitute its private property.   As such they are entitled to every protection afforded by law to any other private property.   Like other property they may be kept by their owners to themselves, or sold or distributed to others, or made known to some and denied to others.   Their communication to many different persons under contracts does not make them public and is not such a publication as destroys their character as property. Strangers may be restrained from wrongfully obtaining possession of the information, and wrongdoers will be prevented from intermeddling with it. These propositions are not now open to question.   *F. W. Dodge Co.* v. *Construction Information Co.* 183 Mass. 62.

The stock exchange has not undertaken to distribute this information itself.   It does not deal immediately with those who receive it by means of the ticker service.   It has no contractual relation direct or indirect with the users of ticker service.   It does not send the quotation to such users.   Under its contract it "agrees, at its own expense, to furnish to the Telegraph Company" the quotations.   The telegraph company in turn is authorized to "furnish said quotations, or any part thereof, or any information therein contained, to its patrons by means of tickers," or otherwise.   One significant feature of this arrangement is that it is made with a common carrier of intelligence, whose facilities for practically instantaneous transmission of the stock quotations throughout the country are of the best.   Manifestly the use of the information most advantageous to the stock exchange is dependent upon its

swiftly coming to the knowledge of those likely to be customers of its members. It seems obvious that the reason for making such contracts with telegraph companies is founded chiefly on their facilities for immediate transmission of the quotations to different parts of the country, facilities possessed by these companies solely because they are performing a *quasi* public function as common carriers. The persons to whom quotations may be furnished are described in the contract between the stock exchange and each of the telegraph companies as "patrons" of the telegraph company. That is the exactly correct word to describe the relation contemplated by the contract between the telegraph company and the user of the ticker. · The user of the ticker is a customer of the telegraph company. He is not the recipient of messages from the stock exchange nor its customer nor contractee. That is plain from the frame of the contract. The transaction constitutes in effect a kind of sale of the quotations from the stock exchange to the telegraph company. The stock exchange does not use the telegraph company as a means for selling its property to others. It makes a sale directly to the telegraph company. The stock exchange receives annually from the telegraph company a large sum of money for the delivery of the information. The sender of ordinary messages is not paid by the telegraph company for sending them. To treat that annual payment as on account of sending messages would constitute a gross preference of the stock exchange over the rest of the public sending telegraphic messages. Such an intent cannot be presumed. The amount of the payment to the stock exchange, so far as disclosed by the contract, bears no direct relation to the amount which the telegraph company may receive from its ticker service. Plainly it is not the ordinary case of one person sending messages to another by the telegraph for a tariff charge. In this connection the telegraph company is not acting wholly as a common carrier in the conventional sense. It is conducting the business of distributing information on its own account through facilities acquired and held by it because it is a common carrier, not for a fixed transportation charge, but for its own profit. Having paid a gross sum for the information, it proceeds to make whatever money it rightly may by disseminating that information at its own expense and through its own instrumentalities, to such customers as it may secure. It

has the right to subdivide the quotations and rearrange them, and to deliver them in whole or in part or in such combination as it chooses. That is one of the express terms of its contract. The affair becomes its venture and not primarily or in this aspect at all the venture of the stock exchange. The only limitations professed to be expressed by the contract upon the absolute right of the telegraph company to deal with the quotations as its own are those tending to prevent the destruction of their value by being taken surreptitiously or otherwise, none of which are here in question, and that no one shall be furnished a ticker without approval of the stock exchange, for the single purpose of preventing the illegal use of the information. It cannot be contended on this record that that is the real ground of the refusal by the stock exchange to approve the application of Foster. No evidence of consequence was offered before the commission on this ground. The privilege conferred upon the telegraph company and the rights acquired by it under the contract are not solely those of a common carrier or the ordinary transmitter of intelligence. They savor of those of a proprietor dealing with his own. It does not seem necessary to analyze more accurately the kind of transaction entered into between the stock exchange and the telegraph company. The latter acquired a kind of right in the quotations which has some of the incidents of property. *Illinois Commission Co.* v. *Cleveland Telegraph Co.* 56 C. C. A. 205. When the stock exchange parted with that right to such a person as a telegraph company, it subjected that right to the necessary characteristics and limitations which inevitably attach to rights belonging to such an owner. Whatever may be said as to the right of a *quasi* public corporation to acquire purely private property has no application to the facts here disclosed. The property acquired by the telegraph companies in the stock quotations has no value to them except as they use their public franchises, granted and exercised solely because of the public service they are organized to render, in sending these quotations to financial centres for distribution by sale to their patrons. They are able to secure patrons in the case at bar solely through the exercise of their public functions in and under the streets of Boston. Such property, destined to such use as are the quotations, is as subject to public regulation in its use as are its other public functions. The property right is merely incidental to the public service function.

Telegraph companies exercise a public employment and are bound to serve all the public without discrimination. They may impose proper rules to which their patrons must conform, but these regulations must apply alike to all. They are a kind of common carrier. *Primrose* v. *Western Union Telegraph Co.* 154 U. S. 1. *Pensacola Telegraph Co.* v. *Western Union Telegraph Co.* 96 U. S. 1. *Western Union Telegraph Co.* v. *Call Publishing Co.* 181 U. S. 92. *Marconi Wireless Telegraph Co. of America* v. *Commonwealth,* 218 Mass. 558, 568. *Cumberland Telephone & Telegraph Co.* v. *Kelly,* 87 C. C. A. 268. They are subject to regulation under legislative authority on the ground that they are impressed with a public character. They are enabled to use public ways in Boston for wires and conduits and underground cables and thus to carry on their business, including the ticker service, only because they carry on business of a public character which is to be exercised under public control. *Pierce* v. *Drew,* 136 Mass. 75. *New England Telephone & Telegraph Co.* v. *Boston Terminal Co.* 182 Mass. 397, 399. See *Attorney General* v. *Haverhill Gas Light Co.* 215 Mass. 394. When such corporations have acquired rights in the disposal of which the public are interested, they must deal with those rights in accordance with the requirements of public regulations. The rights which these telegraph companies have acquired in connection with the quotations are beyond those merely incident to the transmission of intelligence from one person to another. They involve the distribution and dissemination of information as to which it has assumed far greater duties than those of simple transmission, and as to which its facilities growing out of its public character must be used. In this respect the case at bar is strictly analogous to those where patentees of telephones have undertaken to lease instruments subject to a limitation inconsistent with the public duties of the lessee, or which disable the lessee from performing its full obligation to the public. Many such cases have arisen and it generally has been held that such limitations have been repugnant to the general purpose of the lease of telephones, which is to serve the public without discrimination or favor. *State* v. *Bell Telephone Co.* 23 Fed. Rep. 539. *Delaware & American Telegraph & Telephone Co.* v. *State,* 2 C. C. A. 1. *State* v. *Telephone Co.* 36 Ohio St. 296. *Commercial Union Telegraph Co.* v. *New England Telephone & Telegraph Co.* 61 Vt. 241. *Chesapeake & Potomac Telephone Co.* v.

*Baltimore & Ohio Telegraph Co.* 66 Md. 399, 416. See *Heaton-Peninsular Button-Fastener Co.* v. *Eureka Specialty Co.* 25 C. C. A. 267, 272; *Bement* v. *National Harrow Co.* 186 U. S. 70, 91; *Union Trust & Savings Bank* v. *Kinlock Long Distance Telephone Co.* 258 Ill. 202. See to the contrary, *American Rapid Telegraph Co.* v. *Connecticut Telephone Co.* 49 Conn. 352.

It is a necessary consequence that the property or *quasi* property rights acquired by the telegraph companies in the quotations under their contracts with the stock exchange are subject to regulation by public boards to the extent authorized by St. 1913, c. 784, and exercised by the order of the public service commission here under review.

It follows that the condition in the contracts between the telegraph companies and the stock exchange, whereby the attempt is made to limit the persons, among law abiding citizens, to whom the quotations may be delivered, cannot stand against regulation by a public authority to insure indiscriminate distribution.

There is nothing inconsistent with this conclusion in *Board of Trade of Chicago* v. *Christie Grain & Stock Co.* 198 U. S. 236, *Hunt* v. *New York Cotton Exchange,* 205 U. S. 322, and *Board of Trade of Chicago* v. *Cella Commission Co.* 76 C. C. A. 28. Those decisions protect the owners of quotations against theft. They involve no principle touching the regulation of service rendered by a telegraph company respecting information as to which it has assumed obligations and acquired rights such as those here disclosed.

There are numerous decisions, some by courts not of last resort, upon questions more or less similar to the one here presented. The result here reached is supported by the principle followed in *Smith* v. *Gold & Stock Telegraph Co.* 42 Hun, 454, *Friedman* v. *Gold & Stock Telegraph Co.* 32 Hun, 4, *Shepard* v. *Gold & Stock Telegraph Co.* 38 Hun, 338, *Western Union Telegraph Co.* v. *State,* 165 Ind. 492, 500, 501, *New York & Chicago Grain & Stock Exchange* v. *Board of Trade of Chicago,* 127 Ill. 153, and *Tucker* v. *Western Union Telegraph Co.* decided by the Supreme Court of Erie County, New York, in June, 1915, affirmed by Appellate Division in November, 1915, 156 N. Y. Supp. 1148, and is contrary to *Matter of Renville,* 46 App. Div. (N. Y.) 37, *Sterrett* v. *Philadelphia Local Telegraph Co.* 18 Weekly Notes of Cases, 77, and perhaps to

*T. Griffin & Co.* v. *Western Union Telegraph Co.* 8 Ohio Decisions Reprint, 572, *Cain* v. *Western Union Telegraph Co.* 10 Ohio Decisions Reprint, 72.

The jurisdiction of the public service commission extends to telegraph companies by the express terms of St. 1913, c. 784, § 2. The use of wires and conduits in and under the streets by the telegraph companies in the ticker service renders that kind of service subject to public regulation. It is the "transmission of intelligence within the Commonwealth by electricity," and "service" connected therewith as the word "service" is used in §§ 2, 10, 14, 17, 20, 22, 23 of the statute.

In this aspect of the case it is unimportant that the stock exchange is not a party to the proceedings. Whatever may be its interest in the subject matter, it is not a necessary party.* These proceedings deal only with the rights acquired by the telegraph companies in the quotations. Cases like *Lawrence* v. *Smith,* 201 Mass. 214, and *Gregory* v. *Stetson,* 133 U. S. 579, 586, are not pertinent in this connection. The rights here in issue arise under an attempted legislative regulation of the conduct of a public service corporation, and hence cases like *Express Cases,* 117 U. S. 1, where that element was absent, are not apposite.

The contract between the stock exchange and the telegraph companies was made subsequent to the enactment of the statute.† Manifestly such a contract cannot be pleaded in bar to the valid exercise of the police power under that statute. Contracts, though enforceable when made, are not enforceable to override such an exercise of the police power. *Louisville & Nashville Railroad* v. *Mottley,* 219 U. S. 467, 480. *New York Central & Hudson River Railroad* v. *Gray,* 239 U. S. 583.

It seems to us to follow that the telegraph companies are not exonerated from complying with an otherwise lawful order of the public service commission by the terms of their several contracts with the stock exchange.

---

* Of course the stock exchange, being a voluntary unincorporated association, could not technically be made a party. It is unnecessary to explain at length how the interests of its members might be represented in a suit like the present. *Pickett* v. *Walsh,* 192 Mass. 572, 589, 590. *Wilkinson* v. *Stitt,* 175 Mass. 581, 584.

† The contract in force when the order was passed was dated July 1, 1914. St. 1913, c. 784, went into effect on July 1, 1913. See § 30 of that statute.

The transactions disclosed on this record as having been dealt with by the public service commission, in our opinion did not constitute interstate commerce. The sending of the quotations from New York to Boston over wires in the ordinary course of telegraphy manifestly was interstate commerce. But, as has been pointed out, the telegraph companies as to their ticker service sent no messages from New York to the individual ticker subscriber. The quotations as messages were sent by the Morse code from New York to the telegraph companies at their Boston offices. The quotations there were transferred by their own employees to instruments of a different character. By the ticker service the information was delivered to their patrons in Boston. The telegraph companies, in making this transmutation from the Morse code telegraphic message, by which the quotations came from New York to their Boston offices, to the plain English of the tape on the ticker service through their own instrumentalities and mechanical devices, and through their own servants in their Boston offices, were pursuing a course somewhat, although not precisely, analogous to breaking bulk of merchandise received by interstate commerce, putting it into smaller packages and delivering it in retail trade. The interstate transmission ended when the quotations reached the Boston offices of the telegraph companies.. The subsequent acts in delivering the information upon the tickers in the offices of their customers were new and independent transactions. It was in effect a sale at retail of the information which had been received by interstate commerce. In principle it is the same as if the telegraph companies had caused to be set up in type the information after it was received at their Boston offices and sent by a printed sheet to each of their patrons. It accomplishes the same result through the mechanism of the ticker. No messages have been received in New York directed to their patrons, who are subscribers to the ticker service. The telegraph companies have secured their patrons by their own efforts, and for consideration paid directly by the patrons to the telegraph companies and wholly retained by the latter to their own uses, delivery is made of the quotations to the patrons. That transaction, so far as touches compensation, is entirely between their patrons and the telegraph companies. No one else has any connection with that matter. The stock exchange has no concern with it.

The immunities and characteristics which inhere in an original package are not applicable to such transactions and afford no protection against State regulation of retail sales or distribution of imports. *Austin* v. *Tennessee,* 179 U. S. 343. *Mutual Film Corp.* v. *Industrial Commission of Ohio,* 236 U. S. 230, 240. The principle of sales in the original package of goods transported in interstate commerce is foreign to these facts. The nature of the business transacted by the telegraph companies is such that the information contained in the quotations has no value to hold and to keep. Its valuable quality is in practically instantaneous transmutation into articulate form and impartation to large numbers of purchasers. The power to regulate by the State does not depend at all upon the source from which the information is derived, but upon the means adopted for its distribution and communication through wires and conduits in the public streets of a domestic municipality.

These transactions are different in their nature from continuous transportation of merchandise in interstate commerce, notwithstanding change in bill of lading, interruption of transit, and the like, where the initial purpose to transport by interstate or foreign commerce and the movement of the merchandise in such transportation is not changed but continues unbroken from the beginning despite temporary suspension. Cases like *Texas & New Orleans Railroad* v. *Sabine Tram Co.* 227 U. S. 111, and *Illinois Central Railroad* v. *Railroad Commission of Louisiana,* 236 U. S. 157, 163, which illustrate that principle, are inapplicable to the facts in the case at bar.

It is not necessary to multiply citations to show the fulness and completeness of the control of Congress over interstate commerce. It is indisputable. *Minnesota Rate Cases,* 230 U. S. 352, 398–412. *Houston, East & West Texas Railway* v. *United States,* and *Texas & Pacific Railway* v. *United States,* 234 U. S. 342, 351. *Kirmeyer* v. *Kansas,* 236 U. S. 568. The binding authority of these and like decisions is implicitly recognized. They do not seem pertinent to the facts of this record. While no analogy between information and chattels can be perfect, the case at bar in principle is indistinguishable from a purchase of a quantity of like books by the telegraph companies in New York for a gross price for the lot, the transportation of these in interstate commerce to their Boston offices, where the original packages are opened and single books sold there to indi-

vidual customers, to whom they are delivered by messengers of the telegraph companies. The method of dealing with them after the interstate commerce is ended by delivery in bulk at the main offices is no part of interstate commerce. In this respect the case is like the cabs of the railroad employed solely in the local transportation of passengers who have come in interstate travel, which are subject to local regulation and are not a part of interstate commerce. *Pennsylvania Railroad* v. *Knight,* 192 U. S. 21. The ticker service under the circumstances here disclosed is "subject to the law of the State." *Mutual Film Corp.* v. *Industrial Commission of Ohio,* 236 U. S. 230, 241.

The federal interstate commerce act does not appear to us to apply to the transactions here in question. U. S. St. of June 18, 1910. 36 U. S. Sts. at Large, c. 309, § 7. That act relates to the transmission of messages by telegraph in interstate commerce. So far as that act manifests a purpose to regulate the field over which Congress has paramount authority, the right of the State to exercise its police power in the same field ceases to exist, no matter whether the particular act of Congress covers it entirely or not. The police power of the State may be put forth as to a subject not prohibited to the States and within national jurisdiction only when by the silence of Congress the nation has left it open. But when Congress speaks, then it supersedes existing, and prevents future, legislation by the several States on that subject. *Commonwealth* v. *Boston & Maine Railroad,* 222 Mass. 206, 210. *Atchison, Topeka & Santa Fe Railway* v. *Harold,* 241 U. S. 206, 210. The act of Congress here in question does not cover the local delivery by the ticker service radiating from Boston offices, to patrons in that city of each of the telegraph companies, of information bought by the telegraph companies and received in interstate commerce, but delivered in intrastate commerce under the circumstances disclosed in the cases at bar. Therefore, cases like *Northern Pacific Railway* v. *Washington,* 222 U. S. 370, *Erie Railroad* v. *New York,* 233 U. S. 671, 681, *Port Richmond & Bergen Point Ferry Co.* v. *Hudson County,* 234 U. S. 317, 330, *Southern Railway* v. *Railroad Commission of Indiana,* 236 U. S. 439, 447, *Charleston & Western Carolina Railway* v. *Varnville Furniture Co.* 237 U. S. 597, *Western Union Telegraph Co.* v. *Bilisoly,* 116 Va. 562, have no application.

Great stress has been laid in argument upon the danger of the use of quotations by bucket shops. It has been urged that the only effective way, in view of the elusive methods pursued by those violators of the law, of preventing such abuse, is for the stock exchange to have and exercise the power absolutely and without review to approve or to disapprove the applicants for ticker service. The evils arising from that form of gambling need not be minimized. But the accomplishment of a laudable result does not justify the use of means condemned by a public board acting in accordance with a legislative enactment. The present case, however, upon the express finding of the public service commission, goes upon the footing that Foster is not subject to imputation in respect of a bucket shop.

In the view which we take of the case it becomes unnecessary to discuss or decide whether the order may be sustained also as affecting interstate commerce only incidentally and not imposing a direct burden upon it within the principle declared in numerous cases. See, for example, *Western Union Telegraph Co.* v. *James,* 162 U. S. 650; *Western Union Telegraph Co.* v. *Commercial Milling Co.* 218 U. S. 406, 416; *Vermilye* v. *Western Union Telegraph Co.* 207 Mass. 401; *Commonwealth* v. *Peoples Express Co.* 201 Mass. 564, 578; *Atlantic Coast Line Railroad* v. *Glenn,* 239 U. S. 388; *Illinois Central Railroad* v. *Mulberry Hill Coal Co.* 238 U. S. 275; *Pennsylvania Railroad* v. *Puritan Coal Mining Co.* 237 U. S. 121; *Missouri, Kansas & Texas Railway* v. *Harris,* 234 U. S. 412; *Missouri Pacific Railway* v. *Larabee Flour Mills,* 211 U. S. 612; *St. Louis, Iron Mountain & Southern Railway* v. *Arkansas,* 240 U. S. 518.

The petition of the telegraph companies is to be dismissed with costs. In the petition by the public service commissioners, a decree is to be entered enjoining the telegraph companies to comply with the order of the public service commission.

*So ordered.*