THE CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF BALTIMORE CITY *vs.* THE BALTIMORE AND OHIO TELEGRAPH COMPANY OF BALTIMORE CITY.

*Telegraph—Telephone—Act of* 1884, *ch.* 360—*Legislative power in respect of Telephone companies—Unjust discrimination—Mandamus.*

The term " telegraph " which means and includes any apparatus or adjustment of instruments for transmitting messages or other communications by means of electric currents and signals, embraces the " telephone."

A company organized as a telegraph company, under the general incorporation law, before the passage of the Act of 1884, ch. 360, is fully authorized to do a general telephone business; and in doing such business, it is subject to the provisions of the general incorporation law that apply to telegraph companies.

The telegraph and telephone are public vehicles of intelligence, and they who own or control them can no more refuse to perform impartially the functions that they have assumed to discharge, than a railway company, as a common carrier, can rightfully refuse to perform its duty to the public. They may make and establish all reasonable and proper rules and regulations for the government of their offices and those who deal with them; but they have no power to discriminate, and while offering to serve some, refuse to serve others; they must serve all alike, upon compliance with their reasonable rules and regulations.

They cannot be exonerated from the performance of such duty by any conditions or restrictions imposed by contract with the owner of the invention applied in the exercise of the employment.

The Legislature of the State has full power to regulate the service of telephone companies as to the parties to whom facilities should be furnished, notwithstanding the instruments employed are the product of a patented invention.

There is nothing in the rights secured by the letters patent to Bell, and now held by the American Bell Telephone Company, nor in the contract of the 23rd of May, 1882, and the prior contract of the 10th of November, 1879, that would justify the appellant in attempting to impose upon the proposed subscription to the Exchange by the appellee, the restrictive conditions by which an unjust discrimination was made against the appellee, and in favor of a competing company.

A petition was filed by the appellee, praying that a writ of *mandamus* might issue, commanding the appellant to place a telephone instrument in the office of the appellee, located in the City of Baltimore, and that the same might be connected with the central Exchange of the appellant, as required by its charter, and that the messages and despatches to the appellee from parties connected with said Exchange, and messages and despatches from the appellee to said parties, might be received and transmitted in good faith and with impartiality. HELD:

That the application by the appellee for a *mandamus*, was the proper remedy in the case.

APPEAL from the Superior Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., ROBINSON, IRVING, and BRYAN, J.

*Charles J. M. Gwinn,* and *Wager Swayne,* for the appellant.

An application for a *mandamus* is addressed to the sound judicial discretion of the Court; *State vs. Kirkley,* 29 *Md.,* 109; *George's Creek Coal & Iron Company vs. County Commissioners,* 59 *Md.,* 259; but this discretion must be exercised under the settled rules of law. *Hardcastle vs. Maryland & Delaware Railroad Co.,* 32 *Md.,* 35.

The purpose of the proceeding is to require the person, who is named as the defendant, to do something, which it is supposed to be his duty to do, and which the party prosecuting the writ has a right to have done. *Smith vs. Erb,* 4 *Gill,* 459, 460; *Tapping on Mandamus,* 76 *Law Lib., m. p.* 10.

The proceedings in a *mandamus* case are akin, both directly and indirectly, to a common law action; and the general rules of common law pleading are strictly applicable thereto. *Tapping on Mandamus,* 76 *Law Lib., m. pp.* 8, 309, 348; *Harwood vs. Marshall,* 10 *Md.,* 464. The changes made in the common law proceedings by the Maryland statutes did not change their essential nature. *Weber vs. Zimmerman,* 23 *Md.,* 53.

In England, when any person does not, although duly requested, or required, do that which it is his duty to do, in any case to which the remedy by writ of *mandamus* is applicable, the person aggrieved may make application to the proper Court for a rule for a writ of *mandamus* against the person who has so aggrieved him. *Tapping on Mandamus,* 76 *Law Lib., m. pp.* 284, 285. The application should be supported by affidavits showing such refusal; *Ibid, m. p.* 287; and also by affidavits showing, in precise terms, the supposed failure of duty, which was complained of. *Ibid, m. p.* 293.

Usually the attorney asking the rule frames it, although the Court, in difficult or doubtful cases, may suggest the form of the rule.   *Ibid, m. p.* 299.

In Maryland practice, Art. 59, of the Code, no previous demand or refusal is required.   *Mottu vs. Primrose,* 23 *Md.,* 501.   The application for the writ of *mandamus* is made by petition, verified by the affidavit of the applicant, setting forth fully the grounds of his application. The applicant must set forth, in such petition, the precise mandate, which he wishes the Court to enforce by its writ, because our law upon the filing of such petition, requires that the Judge or Court, to which it is addressed shall lay a rule, requiring the defendant therein named, to show cause why a writ of *mandamus* should not issue *as prayed.*   Art. 59, sec. 2, of the Code.   A Maryland Court cannot grant, by the writ of *mandamus,* any relief which is not specifically prayed for.   *Booze vs. Humbird,* 27 *Md.,* 5.

Inasmuch as strict rules of pleading apply to petitions in *mandamus* cases, it must be determined whether the averments made in the petition of the appellee supported and justified the mandatory clauses which it asked the lower Court to embody in a writ of *mandamus* directed to the appellee.

It may be assumed in this case that the appellant was not a common carrier, but a bailee, performing, through its agents, a work for its employers, according to certain rules and regulations, which, under the law, it has a right to make for its government.   *Birney vs. New York & Washington Telegraph Co.,* 18 *Md.,* 358.

No law regulates the amount which it shall charge for the use of its telephone instruments, and for connection with its telephone exchange.

It is bound only to receive dispatches from and for other telegraph lines, associations and companies, and from and for any individual, and to transmit such de-

spatches in the manner established by its rules and regulations, in the order in which they are received, with impartiality and good faith.    Act of 1868, ch. 471, sec. 133.

As it is a bailee it may contract with each person desiring to use its telephones or exchange upon terms proportioned to the amount of labor and expense which the particular employment may entail upon it.

The only obligation which can be imposed upon it by any rule affecting its public employment, or by section 133 of the Act of 1868, chap. 471, is that it shall allow all persons making *like and equal use* of its telephones, or exchange, to contract for such like and equal use *upon the same terms.*    This is the only *impartiality* upon which the appellee had any possible right to insist.

Now the *gravamen* of the complaint of the appellee was that the appellant had placed certain of its telephones in the offices of the Western Union Telegraph Company in Baltimore City, and had connected these with its central exchange, but had denied "*a like use*" of its telephones to the appellee, although the appellee was engaged in the same business with the Western Union Telegraph Company, and was a competitor with such company,—and although the appellee was willing to pay for the same when requested, and to execute a reasonable contract for the use thereof.

But the appellee did not, as it ought to have done, set forth in its petition for a *mandamus*, the form of contract, for the use of the telephone and exchange of the appellant, which it was willing to make with the appellee, or, which amounts to the same thing, point out the portions of the form of contract tendered by the appellant, which it was willing to execute, and the portions which in its judgment it ought not to be required to execute, or pray that the appellant might be required to give it the use of its telephones and exchange upon one class, or other of the terms thus indicated.

It did not in its petition aver that it was willing to obtain such use by entering into contracts of the tenor and effect, *mutatis mutandis*, of those under which the appellant had given, and the Western Union Telegraph Company had obtained, the right to use such telephones and connection, and pray that the appellant might be ordered to give it the use of its telephones and exchange upon the same, or proportionable terms:

It prayed on the contrary for a relief not supported by any averment in its petition, or by any evidence adduced by it. It prayed the lower Court to issue its mandate, requiring the appellant to place a telephone instrument in the office of the appellee and to connect the instrument so placed with the exchange of the appellant and to transmit messages to the appellee from parties connected with the exchange, and from the appellee to parties connected with the exchange, without imposing upon the appellee the necessity, as a condition precedent, of entering into any contract whatever with the appellant, or prescribing any terms whatever upon the appellee as the condition of its enjoyment of the privilege asked for. *George's Creek Coal and Iron Co. vs. County Commis. of Allegany County,* 59 *Md.*, 259. The lower Court, considering the allegations and exhibits of the petitioner, and the agreed statements of facts, ought to have determined that the writ of *mandamus* asked for should be refused, and the petition containing such a prayer, be dismissed. *Legg vs. Mayor, &c., of Annapolis,* 42 *Md.*, 223.

The contract between the Western Union Telegraph Company and The Bell Telephone Company, was made for a valuable consideration, and the provision that the latter company would not permit the transmission of certain messages, &c. in competition with such telegraph business of the Western Union Telegraph Company, or that of the Gold and Stock Telegraph Company, is believed to be valid and binding upon all parties to the said contract.

OCTOBER TERM, 1886.     405

Chesapeake & Potomac Teleph. Co. *vs.* Balto & Ohio Teleg. Co.

The invention of Bell belonged to him as rightfully as
any house he may have built and owned, or as any coat
which he had paid for and worn. *Sloat vs. Patton,* 1
*Fisher,* 154; *Densmore vs. Schofield,* 102 *U. S.,* 375, 378.

The property and ownership of the American Bell
Telephone Company, as assignee of Bell, in the monopoly
intended by law to be created by the Bell patents, were
as absolute as were the ownership and property of Alex-
ander Graham Bell in such monopoly before the assign-
ment. *Gayler vs. Wilder,* 10 *Howard,* 494.

The ownership of the American Bell Telephone Com-
pany of telephone apparatus, constructed by it or by its
agents under the Bell patents, being absolute and exclu-
sive, it had a right in granting any license to use this ap-
paratus to limit such use by any conditions which it saw
proper to impose upon the licensee. The licensee ac-
quired, and could give no rights, except such as such
licensee possessed, and was by the terms of his license
permitted to part with. *Mitchell vs. Hawley,* 16 *Wal-
lace,* 550.

For instance, it had the right in any license which it
might issue to use such apparatus, to define and limit the
territory in which it should be used. *Wicke vs. Kline-
hecht,* 7 *Offi. Gaz.,* 1098. It could define and limit the
number of such apparatus which could be used. *Bloomer
vs. Gilpin,* 4 *Fisher,* 50; *Wilson vs. Rousseau,* 4 *Howard,*
646, 686. It could prescribe the number of persons who
might be employed by the licensee in using each of such
apparatus. *Brooks vs. Byam,* 2 *Story, C. C. Rep.,* 543.
It could confer a segregated right to make a particular
use of the apparatus. *Gamewell Fire Alarm Tel. Co. vs.
City of Brooklyn,* 14 *Fed. Rep.,* 256. It could define,
strictly, the place at which the right so conferred might
be used. *Rubber Co. vs. Goodyear,* 9 *Wallace,* 788, 799.
It could prescribe the period of time within which any of
such apparatus might be used. *Mitchell vs. Hawley,* 16
*Wall.,* 544.

Telephone lines are, substantially, telegraph lines; *Attorney-General vs. Edison Telephone Company of London, L. R.*, 6 *Q. B. D.*, 244; *Wisconsin Telephone Co. vs. Oshkosh*, 31 *Alb. L. J.*, 350; and as such are considered in this State to be only bailees, performing, through their agents, work for their employer according to certain regulations, which, under the laws of Maryland, they have a right to make for their government. Act of 1868, ch. 471, sec. 133. *Birney vs. New York & Washington Printing Tel. Co.*, 18 *Md.*, 358; *Smithson vs. U. S. Tel. Co.*, 29 *Md.*, 167.

*E. J. D. Cross*, and *John K. Cowen*, for the appellee.

A patented invention has no more sacredness about it than any other property. " Where, by the application of an invention or discovery, for which letters patent have been granted by the United States, tangible property comes into existence, its use is to the same extent as that of any other species of property, subject within the several States to the control which they may respectively impose in the legitimate exercise of their powers over other purely domestic affairs, whether of internal commerce or of police." *Patterson vs. Kentucky*, 97 *U. S.*, 501; *Webber vs. Va.*, 103 *U. S.*, 344; *Hockett vs. The State*, 105 *Indiana*, 254, 257.

That the employment of the appellant is a public one is very clear. Its business is a public necessity. It is invested with the power of occupying the public highways and streets of the City of Baltimore for its business. It is likewise invested with the power of eminent domain, the right to take private property for its uses; this latter fact alone shows that the appellant is engaged in a public employment, because private property cannot be taken *in invitum* except for a *public use*. This being the case, it is now the well settled law that property thus devoted to a public use is subject to judicial and legislative regulation and control. *Munn vs. Illinois*, 94 *U. S.*, 113.

In exercising this control the Courts have held that it is the duty of a company thus engaged in a public business to afford like facilities to members of the same class in the community. The rule is thus stated by a late writer upon public policy: " Any contract made by one engaged in business impressed with a public character, by which undue discrimination is made in favor of the covenantee, is void. It matters not that the business is done with inventions patented under Federal laws securing monopoly therein to its owners." *Greenwood on Public Policy, Rule* 538, *page* 629, *Sub-rule* 1, *page* 636.

This principle has been enforced against gaslight companies. *Shepherd vs. Milwaukee Gaslight Co.*, 6 *Wis.*, 526 m. p. 539; *Gaslight Co. of Baltimore vs. Colliday*, 25 *Md.*, 1; *People vs. Manhattan Gaslight Co.*, 45 *Barbour*, 136; *New Orleans G. Light & Banking Co. vs. Paulding*, 12 *Rob.*, (*La.*,) 378.

The same rule has been enforced against railroad companies. In the charters of most of the railroads no provision will be found requiring them to serve all persons alike, in the performance of their public duties; but the Courts have established as a rule of the common law, the principle that all persons in like circumstances are entitled to like facilities. *Hayes vs. Pennsylvania R. R. Co.*, 12 *Fed. Rep.*, 309; *Scofield vs. The Railroad Co.*, 43 *Ohio State*, 571; *Vincent, et al. vs. Chicago & Alton R. R. Co.*, 49 *Ill.*, 33; *Chicago & North Western Ry. Co. vs. The People*, 56 *Ill.*, 365, 377, 378, 379, 380; *Messenger, et al. vs. The Pennsylvania R. R. Co.*, 36 *N. J. Law Reports*, 407; *Same case on appeal*, 37 *N. J. Law*, 531; *McCoy vs. C. Q. St. L. & C. R. R. Co., et al.*, 13 *Fed. Rep.*, 3.

The same rule has been enforced against telephone companies upon the ground that they were exercising a public employment, and they must afford like facilities to all. *State vs. Nebraska Telephone Co.*, 24 *American Law Rep.*, 263; *and* (8 *Am. & Eng. Corporation Cases*,) 1;

*Hockett vs. The State,* 105 *Indiana,* 250; *The Central Union Telephone Co. vs. Bradbury,* 106 *Indiana,* 1.

A contract contrary to the provisions of the statute requiring equal facilities, or contrary to a rule of public policy announced by the Courts, is void. The contract between the Western Union Telegraph Company and the National Bell Telephone Company prohibiting the appellant from transmitting the messages of any other telegraph company except that of the Western Union, is, therefore, void. This point has been expressly decided without reference to any statutory provision such as is found in the Maryland Act of 1868. *Baltimore & Ohio Telegraph Co. vs. The Bell Telephone Co., U. S. Circuit Court, Eastern Dist. of Missouri,* 8 *Am. & Eng. Corporation Cases,* 7; *State, ex rel. American Union Telegraph Co. vs. Bell Telephone Co.,* 22 *Albany Law Journal,* 363; 10 *Central Law Journal,* 437.

This last case was decided by Judge THAYER of the St. Louis Circuit, and a *mandamus* was issued precisely as in our case; it was taken on appeal to the Missouri Court of Appeals, and then dismissed by the appellant. *Commonwealth of Penn., ex rel. Balto. & Ohio Telegraph Co. vs. The Bell Telephone Co. of Phila., Legal Intelligencer, Dec.* 11, 1885, *affirmed by the Supreme Court of Penna.,* (*see* 3 *Cent. Rep.,* 907;) *Louisville Transfer Co. vs. American District Telephone Co.,* 1 *Ky. L. Journal,* 144; 24 *Alb. L. J.,* 283.

*Mandamus* is a proper remedy. The fact that the Act of 1868 imposes a penalty of one hundred dollars for the refusal of the appellant to transmit the messages of the appellee, constitutes certainly no bar to relief by *mandamus.*

Because the injury to the appellee is of a kind manifestly impossible to measure, with any approach of certainty, by damages or by the statutory penalty. This injury to the petitioner is a continuing one, and is an exclusion of its telegraph from communication with the

business portion of the community. Its business, there-
fore, suffers in a manner not susceptible of computation,
and there is, therefore, no adequate specific remedy other
than by *mandamus*. *Rex vs. Severn & Wye Railway Co.*,
2 *Barn. & Ald.*, 646; *In re Trenton Water Power Com-*
*pany*, 20 *N. J. L.*, 660; *Habersham vs. S. & O. Canal Co.*,
27 *Georgia*, 677.

ALVEY, C. J., delivered the opinion of the Court.

This was an application by the appellee, a telegraph
company, to the Court below for a mandamus, which was
accordingly ordered, against the appellant, another tele-
graph company, but doing a general telephone business.

Both the appellant and appellee are corporations formed
under the general incorporation law of this State, (Act
1868, ch. 471,) and both were organized "for constructing,
owning, leasing and operating telegraph lines within this
State, or from or to any point or points within this State,
or upon the boundaries thereof." The appellee was in-
corporated on the 7th day of January, 1882, by the name
of the Baltimore and Ohio Telegraph Company of Balti-
more City, and the appellant was incorporated on the 10th
day of March, 1884, by the name of the Chesapeake and
Potomac Telephone Company of Baltimore City. The
principal offices of both companies are in Baltimore City;
the appellee doing a large and extensive general tele-
graph business, and the appellant doing a general tele-
phone business.

Section 133 of the General Incorporation Law declares
that "Any person, association or corporation, owning any
telegraph line doing business within the State, *shall re-*
*ceive despatches from and for other telegraph lines, asso-*
*ciations and companies, and from and for any individual,*
*and shall transmit such despatches in the manner estab-*
*lished by the rules and regulations of such telegraph lines,*
*and in the order in which they are received, with impar-*

*tiality and good faith,* under the penalty of one hundred dollars for every neglect or refusal so to do, to be recovered, with costs of suit, in the name and for the benefit of the person or persons sending or desiring to send such despatch; provided, however, *that arrangements may be made with the proprietors or publishers of newspapers for transmission of intelligence of general and public interest, for the purpose of publication out of its order."* And by the amendatory Act of 1884, ch. 360, the general incorporation law is made in terms to confer authority to form corporations to construct, own or operate telephone as well as telegraph lines; and by the same amendatory Act, it is provided that the several sections of the general incorporation law relating to telegraph companies, "shall likewise apply to and have full force and effect in respect to telephone companies created under the provisions of this Act."

This latter Act is supposed to have been passed in order to remove all possible doubt as to the authority, under the general incorporation law, for incorporating telephone companies. But it is clear, if we take the term "telegraph" to mean and include any apparatus or adjustment of instruments for transmitting messages or other communications by means of electric currents, and signals, that term is comprehensive enough to embrace the telephone. And that the telephone is so embraced within the definition of the telegraph has been expressly decided in England, after the most careful analysis and comparison of the different instrumentalities, and the manner of using them, in the two systems. *Att'y-Gen. vs. Edison Telph. Co.,* 6 *Q. B. Div.,* 244. Therefore, notwithstanding the appellant was organized as a telegraph company, under the general incorporation law before the passage of the Act of 1884, ch. 360, it was, and still is, fully authorized to do a general telephone business; and, in doing such business, it is subject to the provisions of the general incorporation law that apply to telegraph companies.

The appellant appears to be an auxiliary company, operating the telephone Exchange under the patents known as the Bell patents. Those patents, formerly held by the National Bell Telephone Company, are now held by the American Bell Telephone Company, a corporation created under the law of the State of Massachusetts. The patents, with the contracts relating thereto, were assigned by the former to the latter company, prior to the 23rd of May, 1882; and it is under a contract, of the date just mentioned, that the appellant acquired a right to use the patented devices in the operation of its system of telephonic exchanges.

In the agreed statement of facts, it is admitted that all the telephones used by the Chesapeake and Potomac Telephone Company, (a company to which the appellant is an auxiliary organization,) and also all the telephones used by the appellant in its Exchange in the City of Baltimore, and elsewhere in the State, are the property of the American Bell Telephone Company. It is alleged by the appellee and admitted by the appellant, that the offices of the Western Union Telegraph Company of Baltimore City are connected with the Telephone Exchange of the appellant, and that when a subscriber to the Telephone Exchange wishes to send a message by way of the lines of the Western Union Telegraph Company, the subscriber calls up the Telephone Exchange, and the agent there connects him with the office of the Western Union Telegraph Company, and the subscriber thereupon telephones his message over the lines of the appellant, to the Western Union Telegraph office; and a like process is repeated when a message is received by the Western Union Telegraph Company for a subscriber to the Telephone Exchange of the appellant. The appellee is a competing company, in the general telegraph business, with the Western Union Telegraph Company. And being such, it made application to the appellant to have a telephone in-

strument  placed  in its  receiving  room in  Baltimore, and
that the same might  be connected  with the Central  Ex-
change of  the appellant in that city ; so that the appellee
might be placed  upon the same and equal footing with the
Western  Union  Telegraph  Company, in  conducting  its
business.   This req uest was refused, unless the connection
be accepted  under certain  conditions and  restrictions, to
be specially embodied in a contract between the two com-
panies, and which conditions and restrictions do not apply
in the case of  the Western  Union Telegraph  Company.

It appears that there were conflicting claims existing as
to priority of invention, and alleged infringement of patent
rights, which were involved in a controversy between  the
Western  Union Telegraph  Company and  others, and  the
National Bell  Telephone  Company, to whose  rights  the
American  Bell  Telephone  Company succeeded; and  in
order to adjust those conflicting pretensions, the contract
of the 10th of Nov., 1879, was entered into by the several
parties concerned.   The contract is very elaborate, and
contains a great variety of provisions.   By this agreement,
with certain exceptions, the National Bell Telephone Com-
pany was to acquire and become owner of all the patents
relating to telephones, or patents for the  transmission of
articulate speech by means of electricity.   But while it
was expressly stipulated, (Art. 13, cl. 1,) that the right
to connect district or exchange systems, and the right to
use telephones on all lines, should remain exclusively with
the National Bell Telephone Company, (subsequently the
American Bell Telephone Company,) and those licensed
by it for the purpose, it was in terms provided, that "such
connecting and other lines are not to be used for the
transmission of general business messages, market quota-
tions, or news, for sale or publication, *in competition with
the business* of the Western Union Telegraph Company, or
with that of the Gold and Stock Telegraph Company.
And the party of the second part, [National Bell Teleph.

Co.] *so far as it lawfully and properly can prevent it, will not permit* the transmission of such general business messages, market quotations, or news, for sale or publication, over lines owned by it, or by corporations in which it owns a controlling interest, nor license the use of its telephones, or patents, for the transmission of such general business messages, market quotations, or news, for sale or publica- tion, *in competition with such telegraph business* of the Western Union Telegraph Company, or that of the Gold and Stock Telegraph Company." The contract of the 23rd of May, 1882, under which the appellant derives its right to the use of the patented instruments, was made in subordination to the prior contract of the 10th of Nov., 1879, and contains a provision to conform to the restrictions and conditions just quoted. In that subordinate contract, it is provided, that "no telegraph company, unless specially permitted by the licensor, can be a subscriber, or use the system to collect and deliver messages from and to its customers," &c.

These contracts are pleaded and relied on by the appellant as affording a full justification, for exacting from the appellee a condition in the contract of subscription to the Exchange, that the latter should observe the restrictions in favor of the Western Union Telegraph Company. The appellant contends that these restrictive conditions in the contracts recited are binding upon it, and that it is not at liberty to furnish to the appellant, being a telegraph company, the instruments applied for and place them in connection with the Exchange, unless it be subject to the restrictive conditions prescribed. And if this be so, the Court below was in error in ordering the mandamus to issue. But is the contention of the appellant well founded, in view of the nature of the service that it has undertaken to perform?

The appellant is in the exercise of a public employment, and has assumed the duty of serving the public while in

that employment.    In this case, the appellant is an incorporated body, but it makes no difference whether the party owning and operating a telegraph line or a telephone exchange be a corporation or an individual, the duty imposed, in respect to the public, is the same.    It is the nature of the service undertaken to be performed that creates the duty to the public, and in which the public have an interest, and not simply the body that may be invested with power.    The telegraph and telephone are important instruments of commerce, and their service as such has become indispensable to the commercial and business public.    They are public vehicles of intelligence, and they who own or control them, can no more refuse to perform impartially the functions that they have assumed to discharge, than a railway company, as a common carrier, can rightfully refuse to perform its duty to the public.    They may make and establish all reasonable and proper rules and regulations for the government of their offices and those who deal with them; but they have no power to discriminate, and while offering ready to serve some, refuse to serve others.    The law requires them to be impartial, and to serve all alike, upon compliance with their reasonable rules and regulations.    This the statute expressly requires in respect to telegraph lines, and, as we have seen, the same provision is made applicable to telephone lines and exchanges.    The law declares that it shall be the duty of any person or corporation owning and operating any telegraph line within this State (which, as we have seen, includes a telephone exchange,) "to receive dispatches from and for any telegraph lines, associations or companies, and from and for any individual," and to transmit the same in the manner established by the rules and regulations of the office, "and in the order in which they are received, with impartiality and good faith."    And such being the plain duty of those owning or operating telegraph lines, or telephone lines and exchanges, within

this State, they cannot be exonerated from the performance of that duty, by any conditions or restrictions imposed by contract with the owner of the invention applied in the exercise of the employment. The duty prescribed by law is paramount to that prescribed by contract.

Nor can it be any longer controverted that the Legislature of the State has full power to regulate and control, within reasonable limits at least, public employments and property used in connection therewith. As we have said, the telegraph and telephone both being instruments in constant use in conducting the commerce, and the affairs, both public and private, of the country, their operation therefore, in doing a general business, is a public employment, and the instruments and appliances used are property devoted to public use, and in which the public have an interest. And such being the case, the owner of the property thus devoted to public use, must submit to have that use and employment regulated by public authority for the common good. This is the principle settled by the case of *Munn vs. Illinois*, 94 *U. S.*, 113, and which has been followed by subsequent cases. In the recent case of *Hockett vs. State*, 105 *Ind.*, 250, where the cases upon this subject are largely collected, it was held, applying the principle of *Munn vs. Illinois*, that it was competent to the State to limit the price which telephone companies might charge for their patented facilities afforded to their customers. And if the price of the service can be lawfully regulated by State authority, there is no perceptible reason for denying such authority for the regulation of the service as to the parties to whom facilities should be furnished.

But while not controverting the general principle stated, it has been strongly urged in argument for the appellant, that the ownership of the American Bell Telephone Company of all telephone apparatus, constructed by that company or its agents, being absolute and exclusive, it had the right in granting any license to use this apparatus to

limit such use by any conditions which it saw proper to impose upon the licensee. That in this case the licensee acquired but a limited right, and that it could impart no greater right to a subscriber to the Exchange than that possessed by the licensee itself.

It is certainly true, as contended by the appellant, that the letters patent granted to Bell conferred upon him, his heirs and assigns, for a limited time, a monopoly in the invention or discovery patented, and the exclusive right to make, use and vend the tangible property brought into existence by the application of the principle of the discovery or invention, for which the patent issued. But it does not follow that those letters patent conferred upon him, or his assignees, any such exclusive right to apply or use the tangible property produced in a maner that other property could not be lawfully used. The license to use the telephone instruments in conducting and operating a telephone exchange, at once dedicated or devoted the instruments, to the extent of the requirements of that system or exchange, to public use; and so soon as the office of exchange was opened to the public, the instruments employed became instruments of public service, and like all other property employed in the service, became subject to public regulation and control. And the fact that those instruments were the product of a patented invention or discovery, and the licensee had agreed to use them in serving the public with certain restrictions, inconsistent with the public regulation, can in no way, nor to any extent, relieve the party in control of the Exchange from the full discharge of his duty under the law.

In the case of *Patterson vs. Kentucky*, 97 *U. S.*, 501, it was held that where, by the application of the invention or discovery for which letters patent had been granted, tangible property had come into existence, its use was, to the same extent as that of any other species of property, subject to State control and regulation. In deliver-

ing the opinion of the Court in that case, Mr. Justice HARLAN said: "These considerations, gathered from the former decisions of this Court, would seem to justify the conclusion that the right which the patentee or his assignee possesses in the property created by the application of a patented discovery must be enjoyed subject to the complete and salutary power with which the States have never parted, of so defining and regulating the sale and use of property within their respective limits as to afford protection to the many against the injurious conduct of the few. The right of property in the physical substance, which is the fruit of the discovery, is altogether distinct from the right in the discovery itself, just as the property in the instruments or plate by which copies of a map are multiplied is distinct from the copyright of the map itself." The same doctrine was reiterated in the case of *Webber vs. Virginia*, 103 *U. S.*, 344, 348.

Now, applying to the case the principles stated, it would seem to be clear that there is nothing in the rights secured by the letters patent to Bell, and now held by the American Bell Telephone Company, nor in the contracts referred to, that justified the appellant in attempting to impose upon the proposed subscription to the Exchange by the appellee, the restrictive conditions to which we have referred. By insisting upon such restrictive conditions there was an unjust discrimination made against the appellee and in favor of a competing company. It was to prevent such discrimination that the law was enacted to which reference has been fully made.

The question presented in this case, and which we have decided, has been presented and decided by other Courts of the country, though not with entire unanimity. In Ohio, under a statute very similar to our own, the question was presented in the case of the *State vs. The Telephone Co.*, 36 *Ohio St.*, 296. In that case the Supreme Court held, that under the statute requiring that tele-

graph companies should receive dispatches from and for other telegraph lines and from and for individuals, and transmit them with impartiality and good faith, a contract between the telephone company and the owner of telephone instruments, providing that the company in the use of the instruments should discriminate as between telegraph companies, was void, and therefore could furnish no justification for the attempted discrimination.

In Connecticut, however, under a statute somewhat similar to our own and that of Ohio, a different conclusion was reached, in the case of the *Am. Rapid Teleg. Co. vs. Conn. Telephone Co.*, 49 *Conn.*, 352. In that case the Court denied the force of the statute, as applied to the owner of the patented instruments, although such instruments were licensed to be used by the local telephone company. That case was strongly pressed in the argument before us, but we have not been able to yield to its authority, though certainly entitled to great respect.

In Pennsylvania, where a statute similar to ours exists, it has been recently held by the Supreme Court of that State, in the case of *Bell Telep. Co. vs. Comm.*, ex rel. *Balto. & Ohio Teleg. Co.*, (*Cent. Reporter, Vol.* 3, *No.* 19, *p.* 907,) affirming the judgment of the Court below for the reason assigned by it that the restrictive or discriminating clause in the contract of the 10th of Nov., 1879, was simply void as against public right: That the telephone company, holding a license for the use of patented devices, could not discriminate against a telegraph company, seeking to use the telephone system in its business of receiving and delivering telegraphic messages. In the opinion adopted by the Supreme Court, there are several other well reasoned opinions referred to, maintaining the same conclusion as to the right of the public, upon principles of the common law, irrespective of statute. Those decisions are founded upon the doctrine of *Munn vs. Illinois, supra,* referred to in a previous part of this opinion.

There were some objections taken to the sufficiency of the allegations in the petition for *mandamus,* and they were ingeniously pressed in argument before this Court. But we do not think the objections well founded. It is clear that *mandamus* is the proper remedy in a case like the present, and we think there is sufficient ground shown for it in the petition.

With the views expressed, this Court is of opinion that the order of the Court below, directing the writ of *mandamus* to issue, should be affirmed, with costs.

*Order affirmed.*

(Decided 5th January, 1887.)