| 53 | 341 |
| 62 | 736 |

THE STATE, P. T. W. DUKE, JR., PROSECUTOR, v. CENTRAL
NEW JERSEY TELEPHONE COMPANY ET AL.

THE STATE, CHARLES G. FOSTER, PROSECUTOR, v. CENTRAL
NEW JERSEY TELEPHONE COMPANY ET AL.

1. A corporation may be organized under "An act to incorporate and
regulate telegraph companies" and its supplement, to operate and con-
demn a route for a telephone line.
2. By force of the act of 1890 (*Pamph. L., p.* 489) interests in several
pieces of land belonging to different owners may be condemned by one
proceeding.
3. A map filed with and referred to in a petition to condemn may be
used to assist in the description of the size and location of the poles.

Two writs of *certiorari*, with a single return to both,
argued together.

These writs of *certiorari* bring up an order, made by a
Justice of the Supreme Court, appointing commissioners to
assess and appraise the damages which the prosecutors may
sustain by reason of the erection of a telegraph or telephone
line over their land.

The petition of the company, upon which the appointment
was made, sets out that the petitioner is a corporation organ-
ized under the provisions of "An act to incorporate and
regulate telegraph companies," and the acts supplementary
thereto. *Rev., p.* 1174.

That the objects of the corporation is to build a line of
telegraph for telegraphic or telephonic communication, or both,
within and through certain counties in the State of New
Jersey, to various cities, towns, boroughs and villages, and
other convenient localities for said business therein. That in
addition to these uses of said line as hereinafter mentioned,
to establish, let, conduct and manage private or other tele-
graphic or telephonic lines, or both, and instruments and other
means and appliances for the use of individuals, firms, cor-

porations, municipalities and others, and to carry on a general telegraph and telephone business, either or both, for all purposes whatsoever upon the whole of said line, in all the localities aforesaid, and in connection with other telegraph or telephone line or lines within the State of New Jersey, and also to purchase, control, lease, let or use and subgrant all patents and licenses and rights now or hereafter existing, for the purposes of the business hereinbefore set out. The petition then sets out the description of the line of telegraph or telephone, and the localities it is intended to traverse. It is to consist of such poles with cross arms, fixtures and appliances as may be necessary to sustain such wires, cables or other electrical conductors as may be required for the purpose of conducting a telegraph or telephone business, or both. It then describes the part of the road, running over the land of the prosecutors, upon which the poles are to be placed, and sets out that a map or diagram is presented with the petition, showing the situation of the road in relation to the land of prosecutors, the intended location of each post or pole, and the distance between each post or pole.

The petition then sets out the size of the poles, the maximum number of wires which they will be required to support, and the minimum distance from the ground to the point where they are to be attached to the poles.

The petition, with the map, was filed, and upon regular notice given, commissioners were appointed.

Argued at November Term, 1890, before Justices KNAPP and REED.

For the prosecutors, *Alfred Mills* and *Mahlon Pitney.*

For the defendants, *Theodore Little* and *Melville Egleston.*

The opinion of the court was delivered by

REED, J. The radical objection raised against the order in question is, that the Central New Jersey Telephone Com-

pany has not the power to condemn lands. The range of the objection is, either that this company has no corporate existence, or, if it has, it has no authority to condemn lands for other than telegraphic uses.

It is argued that this is an attempt to condemn for a use foreign to the corporate business.

To attain a clear view of the foundation upon which the argument leading up to this alleged conclusion rests, it is essential that the legislation relating to telegraph and telephone companies should be passed in review.

The original act entitled "An act to incorporate telegraph companies," passed in 1853, another act entitled "An act relating to telegraph companies," passed in 1855, and a supplement to the first mentioned act, which supplement was passed in 1866, were revised and consolidated in 1875 in an act entitled "An act to incorporate and regulate telegraph companies." *Rev., p.* 1174.

This act provides for a subscription of one-third of the capital stock necessary to be issued for the construction of a line of telegraph ; for depositing with the Secretary of State a description of the line and the localities which it is intended to traverse; the capital of the company; its corporate name. It provides that upon compliance with these conditions they shall become a body corporate.

The act contains directions for organization and other matters not material to the question in this case.

. In 1880 (*Rev. Sup., p.* 1022) a supplement to this act was passed. It provides that any telegraph or telephone company organized by virtue of the act last mentioned, or by virtue of any special act, may apply to the common councils  *  *  * for a designation of streets through which poles may be placed. It further provided for a condemnation of a right of way by such companies.

Then follows a supplement in 1882 (*Rev. Sup., p.* 1023) which provides that "any telegraph company incorporated under the Telegraph act may construct its line by means of underground cables containing wires."

Then follows a supplement in 1887 (*Pamph. L., p.* 119) which provides that when any telegraph or telephone company, organized under the Telegraph act or any special act, shall make an application to certain legislative bodies of municipalities to designate a route through the streets, it shall be the duty of such legislative body to make such designation in writing.

Then follows a supplement in 1888 (*Pamph. L., p.* 546) which provides that a Circuit Judge may, in certain cases, make such designation of streets upon a petition filed by such telegraph or telephone company.

The final supplement to the Telegraph act is that of 1890. *Pamph. L., p.* 489. The first section of this act provides a detailed scheme for condemnation of routes along roads by any telegraph or telephone company.

The second section declares that the provisions of the act to incorporate and regulate telegraph companies and its supplements shall extend to all telephone companies heretofore organized under that act.

From a glance at the last supplement set out, it is apparent that the last section of that act, if valid, contains a plenary grant of power to condemn.

It confers, in explicit terms, upon all telephone companies organized under the Telegraph act, the same power of condemnation possessed by a telegraph company incorporated under that statute.

This section is attacked upon the ground that it is a palpable infringement of the first subdivision of paragraph 4, section 7, article XIV., of the amended constitution.

It is urged that the legislation contained in the second section is concerning a subject foreign to the title of the act, that it is an attempt to amend the Telegraph act by reference to its title only, and by providing that the provisions of that, the Telegraph act, shall be a part of the section, without setting out in full the statute as amended.

I do not regard the settlement of the constitutional question thus mooted essential to a decision of this cause. I am of

the opinion that the right to condemn, set in motion by the petition and order brought up, can be vindicated by an appeal to other legislation.

I think that a telephone company can be incorporated under the original revised act to incorporate and regulate telegraph companies. To state the proposition in another way, I think that the operation of a line of wire for a telephonic service, by a company organized under this act, is not *ultra vires*. If this be so, then a condemnation for a telephone line is within the power granted in the act.

The Telegraph act does not define the kind of business in which the corporation shall engage, apart from the provision the corporators shall subscribe stock for the construction of a telegraph line. The name of such corporation need not indicate the business proposed to be transacted. Any title can be adopted. The only limitation upon the scope of the business is, that it must be within that for which a line of telegraph, in performing its public functions, is used.

It appears from the petition in this case that the objects of the corporation, and the purposes for which it was formed, are to build and construct a line of telegraphic or telephonic communication, or both.

The existence of the corporation for telegraphic purposes, as originally exercised, cannot be denied. Can it condemn also for a line to be devoted wholly or partly to telephonic service?

I think so, because the discovery of this vocal method of communication, and its application to the purposes of the speedy transmission of intelligence, was but a change in detail, but not in substance, of the business for which these companies were clothed with corporate privileges.

They are both services of a public nature which would permit the legislation to confer the power to condemn for each use. They are both designed to convey intelligence between distant places. So far as the owner over whose land their tracks or routes lie, they each are operated with the same appliances. Poles and wires, placed alike, impose exactly the

same servitude upon the land.    With the change in the apparatus at the *termini*, telegraphy becomes telephony.

The former makes the distant message intelligible by words, marks or sounds, the latter by sounds alone.

The same electric fluid is the medium of transmission, and all the inter-terminal structure is the same in both.  A corporation employing either means of communication is executing substantially the same public function in substantially the same way.    The business conducted in either way is within the purpose for which the statute was enacted.

The substantial identity of these methods of transmitting thought is not a novel view of their character.

The notion of the discoverer of the newer method seems to have been that it was a new use to which the system of telegraphy could be applied.

Mr. Bell's specification of his claims in his first petition for a patent is set out in full in the statement of facts prefixed to the opinions in *The Telephone Cases*, 126 *U. S.* 1. In it he says: " What I claim is, (5) the method or an apparatus for transmitting vocal or other sounds telegraphically, as herein described, by causing electrical undulations similar in form to the vibrations of air accompanying the said vocal sounds."

Judicial sentiment, whenever an occasion has arisen for its expression, has uniformly been in the same direction.

In the case of the *Attorney General* v. *The Edison Telephone Company of London*, 6 *Q. B. D.* 244, the court were called upon to consider the relation which the two systems of communication bore to each other, in respect of identity of operation.

Certain acts passed before the invention of the telephone conferred upon the Postmaster General of Great Britain the exclusive privilege of transmitting telegrams within the United Kingdoms, and of performing all the incidental service of receiving, collecting or delivering telegrams.    There were in the acts certain definitions of what should be included in the words " telegraph " and " telegram," but all these defi-

nitions were descriptive of a telegraphic service by signaling. The question was, whether the telephonic transmission of intelligence by the Edison Telephone Company was an infringement upon the monopoly previously granted to the Postmaster General.

In an opinion by Mr. Justice Stephens, the scientific methods and mechanical appliances employed by each were reviewed in an exhaustive opinion. He sums up his observations by saying: "We are of opinion, then, that fully admitting all that has been or, indeed, can be said as to the novelty and value of the telephonic transmitter and receiver, the whole apparatus, transmitter, wire and receiver, taken together, form a wire used for the purpose of telegraphic communication, with apparatus connected therewith for telegraphic communication."

Again, he says: "The great object of the act of 1863 was to give special powers to telegraph companies to enable them to open streets, lay down wires, take land, suspend wires over highways, connect wires, erect posts on the roofs of houses, and do many other things of the same sort. The act was intended to confer powers and to impose duties upon companies established for the purpose of communicating information by the action of electricity upon wires, and absurd consequences would follow if the extent and nature of those powers and duties were made dependent upon the means employed for the purpose of giving the information."

Samples of absurd situations resulting from such a rule are then given.

In the case of *The Wisconsin Telephone Co.* v. *The City of Oshkosh,* 62 *Wis.* 32, a telephone company had organized under a general act authorizing the formation of corporations for the purpose of building and operating telegraph lines, or conducting the business of telegraphing in any way, or for any lawful business or purpose whatever, except certain kinds. The question was, whether this company was a corporation, so as to be relieved from immunity from a municipal tax. It was held that it was a valid corporation, and it seems to have

been so regarded because of the similarity of the two kinds of service. There is no doubt as to the view of the court, that had the act concerning the formation of telegraph companies not contained the clause " or any lawful business," &c., the result would have been the same.

In the case of *The Chesapeake and Potomac Telegraph Co.* v. *Baltimore and Ohio Telegraph Co.*, 66 *Md.* 399, a *mandamus* was applied for by one corporation against another corporation, both of which were organized under an act for the incorporation of telegraph companies. The respondent was organized as a telephone company. The question was, whether it was a corporation subject to the provisions of an act compelling telegraph and telephone companies to receive and transmit messages.

" It is clear," says the Chief Justice, " if we take the term telegraph to mean and include any apparatus or adjustment of instruments for transmitting messages or other communications by means of electric currents and signals, that term is comprehensive enough to embrace the telephone. Notwithstanding the appellant was organized as a telegraph company under the General Incorporation law, it is authorized to do a general telephone business."

No one can read the line of argument by which the conclusions in these cases were reached without perceiving a consensus of judicial opinion, that the device introduced by the discovery of the electric transmission of sounds is but a novel method of accomplishing the object for which telegraphs were erected, and that a corporation erected under an act which empowers it to conduct a line of telegraph can conduct it by means of a system which, for philological and scientific distinction, is called a telephone.

In this view I concur.

The improvements, indeed the revolution in the methods of transacting the business of each of the great corporations, has never given rise to a suspicion that the use of these additional means of accomplishing its corporate purpose was not within the limits of its corporate functions.

The roadbed of a railroad is used for a score of purposes which were not thought of in connection with the management of a railroad when the older charters were granted. Because such a company erects a telegraph line upon its roadbed no additional servitude is imposed upon the land, because the use of the line is incidental to its business.

Or imagine an occurrence more analogous to the present: if railroads should abandon steam as a motive power and introduce another not more dangerous, I have no notion that its use would be *ultra vires,* or that the power to condemn land for a railroad to be so operated would cease to exist under our General Railroad act.

I conclude that the Central New Jersey Telephone Company was a legal corporation possessing all the privileges, including the right to exercise the power of eminent domain, which was conferred by the Telegraph act and its supplements.

I have not thought it necessary to consider how far those supplements to the act to incorporate telegraph companies, which seem to recognize the existence of the right of telephone companies to organize under it, would aid in arriving at the conclusion reached.

That a grant of power to execute a telephone business might be conferred under an act entitled "An act to incorporate telegraph companies," there can be no doubt at all.

These supplements contain no grant of a franchise, but they do contain a recognition of a right in a corporation organized under a Telegraph act to do a telephone business, for this is what the recognition of the right of telephone companies to exist under the act amounts to. These supplements are acts *in pari materia,* and indicate the legislative intent in respect to the meaning to be attributed to the act providing for the operation of a telegraph line. Where such meaning is a subject of doubt, such a construction has its significance.

The limitation upon the force of such construction is, that it must be one of which the word or phrase is capable, and not a forced and unnatural construction.

The effect of such subsequent acts *in pari materia* with the original, in this respect, was discussed by Mr. Justice Wayne in the case of *The United States* v. *Freeman*, 3 *How.* (*U. S.*) 557, and many cases were cited.

But, as already observed, I do not think it necessary to invoke the aid of these acts in reaching the result already announced.

It is again insisted that there is a defect in the petition filed and in the order made thereon, because the petition prays for the condemnation of a right of way across lands of two persons, each person having no interest in the land of the other. The petition seeks an appointment of, and the order appoints, commissioners to condemn a route across the land of Mr. Duke, and also a route across the land of Mr. Foster. I think that there is no substance in this criticism of the papers.

The first section of the act of 1880 (*Pamph. L., p.* 201), as well as the first section of the act of 1890 (*Pamph. L., p.* 489), provides that the names of any number of owners or any number of descriptions of the premises desired may be mentioned in one petition.

The counsel for the prosecutors contend that this provision means, that in case there are several owners of the same piece, having common interests, or there are several pieces belonging to the same owner, then all such owners and all such pieces may be included in one petition. The meaning of the provision is not so confined. The inclusion of several owners of the same piece of land was common and legal without the aid of this statute. The provision was adopted to avoid the trouble and expense of several proceedings against distinct owners, and to authorize that which has been done in this case.

It is again objected that the petition and order do not describe the line of telephone poles and wires, nor the premises to be occupied thereby, nor sufficiently describe the rights to be acquired by said company.

There was a map filed with the petition and referred to in the petition as a map which the petitioner prays may be considered as forming a part of the petition. The petition states that the map correctly exhibits the road adjoining the lands of prosecutors and location of the poles; that the location of each pole is indicated in a small circle of black ink, which circle is numbered in red ink from one to twenty-seven, which is the total number of poles to be erected; that the distances between said poles are indicated by figures in black ink between the circles; the distances of the poles from the fence on the southerly side of the highway is indicated by figures in black ink beside each circle; the distance of the poles from the fence on the northerly side of the highway is indicated by figures in or about the centre of the highway.

The description contained in the petition, as already set forth in connection with the map so filed, admittedly contains a very definite description of the burden to be imposed upon the land. The objection urged is, that the map was not physically attached to the petition. It would have been well to have so attached it.

But it accompanied the petition, was marked with a letter mentioned in the petition as distinguishing it, and it could not have been overlooked or mistaken for anything other than a part of the petition.

I think the description thus given conformed to all legal requirements.

The result is, that both writs are dismissed.